**Carlo VICHI, Plaintiff,**

v.

**KONINKLIJKE PHILIPS ELECTRONICS N.V., LG.Philips Displays Finance LLC, LG.Philips Displays International Ltd., Defendants.**

**C.A. No. 2578–VCP.**

Court of Chancery of Delaware.

Submitted: Aug. 30, 2012.
Decided: Nov. 28, 2012.

Rolin P. Bissell, Esq., Tammy L. Mercer, Esq., Elisabeth S. Bradley, Esq., Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; David R. Marriott, Esq., David Greenwald, Esq., Cravath, Swaine & Moore, LLP, New York, New York, Attorneys for Plaintiff.

Raymond J. DiCamillo, Esq., Nicole C. Bright, Esq., Richards, Layton & Finger, P.A., Wilmington, Delaware; Garrard R. Beeney, Esq., John L. Hardiman, Esq., Sullivan & Cromwell LLP, New York, New York, Attorneys for Defendant Koninklijke Philips Electronics, N.V.

## OPINION

PARSONS, Vice Chancellor.

This action is before me on a motion for summary judgment relating to a dispute between a Netherlands holding company, which controls one of the largest electronics companies in the world, and an Italian businessman, who is the managing shareholder and founder of a large television manufacturing and sales company in Italy.

The holding company is a participant in a joint venture that needed financing and approached the Italian businessman for a substantial loan. The Italian businessman, who had a longstanding business relationship with one of the holding company's other subsidiaries, agreed to make the loan. The joint venture eventually went into bankruptcy and defaulted on its loan obligations, including the loan from the Italian businessman.

The Italian businessman filed this action alleging, among other things, that the Netherlands holding company induced him to make the loan by representing that it would support and continue to back the joint venture. The holding company denies making those representations or having any obligations to the Italian businessman.

The defendant holding company has moved for summary judgment on multiple grounds. As a preliminary matter, the defendant seeks to dismiss all counts be-

cause the plaintiff has no standing. The defendant also contends that some of the claims are time-barred by the doctrine of laches. The defendant further asserts that some claims are governed by English law and barred by the English statute of frauds. Finally, the defendant argues that certain counts of the complaint fail to state a claim as a matter of Italian, Dutch, and Delaware law.

Having considered the parties' extensive briefing and arguments and the record before me at this stage, I find that, for the purposes of summary judgment, the plaintiff's claims are not barred for lack of standing. I also deny summary judgment on the ground of laches based on the existence of genuine issues of material fact as to whether the analogous statute of limitations may have been tolled because the plaintiff's injuries were inherently unknowable. Because the defendant failed to prove foreign law sufficiently to establish its English statute of frauds defense and to defeat the plaintiff's Italian law claim for deceit by a third party and bad faith, I refuse to grant summary judgment on those counts. I grant summary judgment in the defendant's favor, however, on the plaintiff's Italian law claim for breach of implied or oral contract and his Dutch law claim, because both claims fail as a matter of foreign law. Finally, I grant the defendant's motion for summary judgment re-

garding the plaintiff's claim for unjust enrichment.

## I. BACKGROUND

### A. The Parties

Plaintiff, Carlo Vichi, is the managing shareholder and founder of Mivar di Carlo Vichi S.a.p.a.[1] ("Mivar"), a large Italian company engaged in television sales and production. Vichi resides in Milan, Italy.

Defendant Koninklijke Philips Electronics N.V.[2] ("Philips" or "Philips N.V." or "Defendant")[3] is a corporation located in and organized under the laws of the Netherlands. Philips N.V. is a publicly listed holding company with few employees and no operations. Philips N.V. is the parent of the Philips family of companies, which includes hundreds of subsidiaries worldwide operating in a diverse group of industries, ranging from electronics and lighting to healthcare.

Defendant LG.Philips Displays Finance LLC ("Finance") is a subsidiary of LG.Philips Displays Holdings B.V. ("LPD"). LPD, which is not a party to this case, is a joint venture between Philips N.V. and LG Electronics, Ltd. ("LGE"), a South Korean company. Defendant LG.Philips Displays International Ltd. ("International") is also a subsidiary of LPD and was the sole member and manager of Finance.

1. S.a.p.a. or "Societá in accomandita per azioni" loosely translates into a "stock company with personally liable directors." *See* Lorenzo Stanghellini, *Corporate Governance in Italy: Strong Owners, Faithful Managers. An Assessment and a Proposal for Reform*, 6 Ind. Int'l & Comp. L.Rev. 91, 97 (1995).

2. N.V. or "Naamloze vennootschap" is the equivalent of a public limited liability company in the United States. *See CNH Am., LLC v. Equip. Direct–USA, LLC*, 2010 WL 1790364, at *3 (C.D.Ill. Apr. 1, 2010).

3. Although the second amended complaint (the "Complaint") lists five defendants, the only remaining defendant in this case is Philips. I granted a motion to dismiss all claims against two of the named defendants, Peter Warmerdam and Kiam–Kong Ho. *See infra* Part I.C. In addition, on August 19, 2009 and March 3, 2011, I granted default judgments against LG.Philips Displays International Ltd. and LG.Philips Displays Finance LLC, respectively. For purposes of this opinion, therefore, I only refer to the defendant in the singular form.

## B. Facts[4]

### 1. The formation of LPD

LPD was formed on June 30, 2001 as a joint venture between Philips and LGE to operate cathode ray tube ("CRT") television production facilities. Both companies contributed capital, assets, and employees to LPD, but Philips maintained a 50% plus one-share controlling stake.

At formation, LPD expected to have assets valued at $4.58 billion, approximately 36,000 employees, and a global market share of 26% in both color picture tube and color display tube manufacturing.[5] LPD was financed initially by a $2 billion credit facility (the "Bank Loan") consisting of a $1.35 billion term loan and a $650 million revolving credit facility.[6] The Bank Loan was led by JP Morgan Chase Bank, ABN AMRO, and Citibank/Salomon Smith Barney (the "Bank Syndicate").[7]

After just one year of existence, LPD breached the covenants of the Bank Loan and was forced to renegotiate the Loan with the participants. On May 31, 2002, Philips N.V. and LGE agreed to guarantee $200 million of the Bank Loan and provide $250 million—$125 million each—to LPD.[8]

Mivar had been a longtime customer of Philips television components. Felice Albertazzi and Fabio Golinelli, who were employees of Philips S.p.A. ("Philips Italia") (a wholly owned subsidiary of Philips N.V.), were the primary salespeople with whom Mivar dealt.

In 2001, as a result of the formation of LPD, Vichi began purchasing his television components from LPD. Vichi alleges that "Philips notified Mivar that Philips would be conducting its CRT business through LPD."[9] According to Philips, Vichi "understood that LPD was a 'new company,'" but nonetheless "elected" to become a customer of LPD.[10] Albertazzi and Golinelli became part of the LPD sales organization, although they continued to be employed by Philips Italia. Under a "Sales Support Agreement," LPD reimbursed Philips Italia for their salaries.[11] Mivar alleges that Albertazzi and Golinelli emphasized their connection to Philips and described LPD as a part of Philips.[12]

### 2. The loan and notes transaction

In March 2002, LPD and Mivar discussed the possibility of a short-term loan to LPD of Q7 million, which ultimately evolved into a Q25 million loan. Mivar made the 25 million loan to LPD on April 23, 2002, and LPD repaid it on June 27, 2002. While they were negotiating for the Q25 million loan, LPD and Mivar also discussed a second loan to LPD that would be

---

4. Unless otherwise noted, the facts set forth in this Opinion are undisputed and taken from the verified pleadings, admissions, affidavits, and other evidence submitted to the Court.

5. Aff. of Nicole C. Bright in Supp. of Def Koninklijke Philips Elecs. N.V.'s Mot. for Summ. J. ("Philips's Mot.") ("Bright Aff") Ex. 6 ("2001 Confidential Information Memorandum") at 11, 18.

6. Bright Aff. Ex. 17 ("Bank Loan Agreement").

7. 2001 Confidential Information Memorandum.

8. Bright Aff. Ex. 18 ("Amended Bank Loan Agreement").

9. Pl. Carlo Vichi's Mem. in Opp'n to Philips's Mot. ("Pl.'s Answering Br.") 5.

10. Def. Koninklijke Philips Elecs. N.V.'s Opening Br. in Supp. of Its Mot. for Summ. J. ("Def.'s Opening Br.") 11.

11. *See* Bright Aff. Ex. 2 ("Service Level Agreement").

12. *See* Decl. of Alberto Coates in Supp. of Pl.'s Mem. in Opp'n to Philips's Mot. ("Coates Decl.") ¶¶ 12, 16.

closer to Ω200 million. According to Vichi, Albertazzi told him that "Philips wanted to borrow money from Vichi" to demonstrate to the market and Philips N.V.'s lenders that Vichi had confidence in Philips N.V.'s CRT business.[13] Vittorio Necchi, a financial and legal advisor to Vichi and Mivar, engaged in a number of meetings and discussions with Albertazzi and Kiam–Kong Ho, LPD's treasurer, about the terms of the second loan.[14]

In April 2002, Golinelli, Ho, and Necchi met in Hong Kong to negotiate the terms of the larger loan. The parties dispute whether Albertazzi or Ho was the primary negotiator for LPD. Vichi alleges that during the loan discussions, Albertazzi and Golinelli misrepresented that LPD was strong and had a bright future, despite a floundering CRT market.[15] Vichi also avers that Albertazzi represented that Philips "would stand behind LPD to ensure that it could repay Vichi's loan" and that Albertazzi "was 100% Philips," and that "Vichi need not have any concerns about LPD's ability to repay the Loan."[16] Necchi employed the services of Monte dei Paschi di Siena Finance, Banca Mobilare S.p.A. ("MPS Finance"), a large Italian bank, to assist him in the negotiations. MPS Finance used lawyers from Allen & Overy LLP for the transaction. Plaintiff contends, however, that MPS Finance was limited to the role of "arranger" and that Vichi was not independently represented by counsel.[17]

The final terms of the notes (the "Notes") provided for: (1) a 200 million loan to LPD Finance; (2) a guarantee by LPD; (3) a five-year term ending in 2007; and (4) a floating interest rate.[18] The agreed interest rate was 262.5 basis points over the 6 month Euro Interbank Offered Rate (Euribor).[19] The Notes comprised a series of documents signed by employees of LPD, including the Notes themselves, a Fiscal Agency Agreement, a Subscription Agreement, and a Guarantee by LPD.[20] These documents each contained a choice of law provision specifying that the agreements are to be "governed by, and shall be construed in accordance with English law."[21]

S.I.R.E.F. Fiduciaria S.p.A. ("SIREF"), an Italian trust company, purchased the Notes on July 9, 2002. LPD and SIREF also entered into a "Put Option Agreement" whereby SIREF could sell the Notes back to LPD Finance if Philips N.V. ceased to own at least 50% of LPD, which itself was a guarantor of the Put Option Agreement.

### 3. The Offering Circular

The parties had agreed to list the Notes

---

13. *See* Decl. of Vittorio Necchi in Supp. of Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Necchi Decl.") ¶ 10; Decl. of Franco Giavarini in Supp. of Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Giavarini Decl.") ¶ 14.

14. Plaintiff also alleges that Ho represented himself as a "Philips guy." Necchi Dep. 243.

15. *See* Necchi Decl. ¶ 11; Decl. of Carlo Vichi in Supp. of Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Vichi Decl.") ¶ 12; Giavarini Decl. ¶ 16; Decl. of Fabio Golinelli in Supp. of Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Golinelli Decl.") ¶ 37.

16. *See* Necchi Decl. ¶ 15; *accord* Vichi Decl. ¶ 12; Giavarini Decl. ¶ 16.

17. *See* Necchi Decl. ¶ 17.

18. *See* Bright Aff. Ex. 30 ("Fiscal Agency Agreement").

19. *Id.* at PNV0026720.

20. Bright Aff. Exs. 38–40.

21. *See id.* Ex. 30 at PNV0026239, Ex. 38 at PNV0021820, Ex. 39 at PNV0023371; *accord* Ex. 40 at PNV0026316.

publicly on the Luxembourg Exchange.[22] In furtherance of that goal, on August 26, 2002, Allen & Overy issued an offering circular (the "Offering Circular") to be given to prospective buyers of the Notes.[23] The Offering Circular, which was issued in its final form on August 26, 2002, disclosed, among other things, that: (1) LPD was in the process of restructuring its business; (2) LPD was facing a decrease in spending by end customers; and (3) LPD "expect[ed] to incur losses for some time and . . . cannot give assurance that [it] will achieve profitability soon." [24] Most importantly, the Offering Circular disclosed that "[n]either Philips nor LGE is a party or a guarantor of the Notes." [25]

#### 4. Attempted restructuring

In 2002 and 2003, LPD continued to face challenging market conditions.[26] In late 2003, a second financial restructuring became necessary, and LPD met with Mivar and Vichi to discuss the terms of a possible restructuring.[27] The proposed restructuring would have extended the maturity date of the Bank Loan beyond the maturity date of the Notes. Consequently, LPD requested, among other things, that Vichi and Mivar extend the maturity of the Notes to 2012.[28] During the restructuring negotiations, "[Necchi] expressed his view that the shareholders [LG and Philips] did not believe in the long-term viability of LPD." [29] According to the minutes of a 2003 meeting between LPD (represented by its CFO Peter van Bommel, Edmund Li, Albertazzi, and Golinelli) and Mivar (represented by Necchi and Vichi), Necchi indicated that "if creditors are asked to postpone full repayment of their debts till 2012, the shareholders should give strong support by means of shareholders' guarantee." [30]

In February 2004, Vichi made a counter-proposal whereby LGE and Philips each would guarantee 50% of the Notes.[31] In March 2004, Philips N.V. and LGE offered that they each would guarantee $50 million if Vichi would accept the original restructuring proposal.

Ultimately, LPD, Philips N.V., LGE, and the bank participants of the Bank Loan agreed to restructure the loan without Vichi's participation. The restructuring included, among other things, a guarantee by LGE and Philips N.V. for $50 million each.[32]

#### 5. Default and bankruptcy

Thereafter, LPD's financial condition worsened. LPD ultimately defaulted on the Notes and filed for bankruptcy on January 27, 2006.[33] The bankruptcy proceeding is currently pending in the District Court of 's–Hertogenbosch in the Netherlands.[34] Vichi is a member of the Credi-

---

22. *See* Bright Aff. Ex. 21 at V00000007.

23. Bright Aff. Ex. 46.

24. Bright Aff. Ex. 42, Offering Circular, at PNV0029827, PNV0029829, PNV0029832.

25. *Id.* at PNV0029833.

26. *See, e.g.,* Bright Aff. Exs. 50–52.

27. *Id.* Ex. 79.

28. Aff. of Elisabeth S. Bradley in Supp. of Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Bradley Aff.") Ex. 78.

29. *Id.*

30. Bradley Aff. Ex. 78.

31. Bright Aff. Ex. 58.

32. *Id.* Ex. 60 (Part 4) at PNV0030185–86.

33. *Id.* Aff. Ex. 66.

34. *Id.* Aff. Ex. 67.

tors' Committee in that proceeding.[35]

## C. Procedural History

On November 29, 2006, Vichi commenced this action by filing a complaint against Philips and other parties, which charged them with various counts of breach of contract, fraud, unjust enrichment, and breach of fiduciary duty. Following extensive discovery, Vichi filed an amended complaint and, later, a second amended complaint (the "Complaint"). Defendants Philips N.V., Peter Warmerdam, and Kiam–Kong Ho moved to dismiss the claims against them based on lack of personal jurisdiction, *forum non conveniens*, and failure to state a claim.

In an Opinion dated December 1, 2009, I granted the motions to dismiss all claims against Warmerdam and Ho under Court of Chancery Rule 12(b)(2) for lack of personal jurisdiction.[36] I also dismissed Counts III, VIII, and X against Philips under Rule 12(b)(6) for failure to state a claim.[37] As a result, Philips N.V. was the only remaining Defendant[38] and only the following six claims remained against it: Count II (Unjust Enrichment), Count IV (Breach of Implied or Oral Contract under Italian law), Count V (Breach of Oral or Implied Contract under Delaware law), Count VI (Fraud under Delaware law), Count VII (Fraud under Italian law), and Count XI (Breach of Fiduciary Duty under Dutch law).

On July 24, 2012, Philips N.V. moved for summary judgment in its favor on all the remaining claims against it in this action. After extensive briefing, the Court heard argument on August 30, 2012. This Opinion constitutes my ruling on Philips N.V.'s motion.

## D. Parties' Contentions

Philips N.V. seeks summary judgment on several independent grounds. First, Philips N.V. argues that all claims against it should be dismissed because Vichi has no standing. Specifically, Philips N.V. argues that Vichi has not proven he is the owner of the Notes, and that his Complaint failed to include all indispensable parties to this dispute. Second, Philips N.V. avers that all of Vichi's claims except Counts IV and V are barred by a three-year period of limitations. Third, Philips N.V. contends that the Notes' English choice of law provisions mandate the application of English law, and that all of Vichi's claims, except Count XI, are barred by the English statute of frauds. Finally, Philips N.V. alleges that Counts II, IV, VII, and XI independently fail to state a claim as a matter of Italian, Dutch, or Delaware law.

Vichi disputes all of Philips N.V.'s contentions and urges the Court to deny Philips N.V.'s motion for summary judgment. Specifically, Vichi argues that he is the sole owner and beneficiary of the Notes, and, thus, has standing. Vichi also asserts that the statute of limitations should be tolled on three separate theories: (1) Vichi's injuries were inherently unknowable; (2) Philips fraudulently concealed its misconduct; and (3) Vichi reasonably relied on Philips as a fiduciary. Regarding the statute of frauds defense, Vichi responds that: (1) Philips N.V. waived the defense; (2) under English law, the choice of law clause in the Notes does not apply to Vichi's claims; and (3) even if that clause did

---

**35.** *Id.* § 9.1.1.

**36.** *See Vichi v. Koninklijke Philips Elecs. N.V.,* 2009 WL 4345724, at *4–12 (Del.Ch. Dec. 1, 2009).

**37.** *Id.* at *19–21.

**38.** *See supra* note 3.

apply, the English statute of frauds still would not bar Vichi's claims. Finally, Vichi contends that Counts II, IV, VII, and XI do meet the requirements for stating a claim under the law of the jurisdictions whose substantive law governs each of those counts.

## II. ANALYSIS

### A. Standard

"Summary judgment is granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [39] In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence are to be viewed in the light most favorable to the nonmoving party and the moving party has the burden of demonstrating that no material question of fact exists. [40] The party opposing summary judgment, however, may not rest upon the mere allegations or denials contained in its pleadings, but must offer, by affidavit or other admissible evidence, specific facts showing that there is a genuine issue for trial. [41]

In addition, summary judgment may be denied when the legal question presented needs to be assessed in the "more highly textured factual setting of a trial" [42] or the Court "decides that a more thorough development of the record would clarify the law or its application." [43]

Court of Chancery Rule 44.1 provides that matters of foreign law, which abound in this dispute, are questions of law. [44] Therefore, the Court may determine disputes as to foreign law at the summary judgment stage if "there is no genuine issue as to any material fact." [45] Summary

---

**39.** *Twin Bridges Ltd. P'ship v. Draper*, 2007 WL 2744609, at *8 (Del.Ch. Sept. 14, 2007) (citing Ct. Ch. R. 56(c)).

**40.** *Walker L.L.P. v. Spira Footwear, Inc.*, 2008 WL 2487256, at *3 (Del.Ch. June 23, 2008) (citing *Senior Tour Players 207 Mgmt. Co. v. Golftown 207 Hldg. Co.*, 853 A.2d 124, 126 (Del.Ch.2004)).

**41.** Ct. Ch. R. 56(e); *Walker, L.L.P.*, 2008 WL 2487256, at *3 (citing *Levy v. HLI Operating Co.*, 924 A.2d 210, 219 (Del.Ch.2007)).

**42.** *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1239 n. 3 (Del.Ch.1987) (citing *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 257, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948)).

**43.** *Tunnell v. Stokley*, 2006 WL 452780, at *2 (Del.Ch. Feb. 15, 2006) (quoting *Cooke v. Oolie*, 2000 WL 710199, at *11 (Del.Ch. May 24, 2000)).

**44.** *See* D.R.E. 202(e); *see also* Ct. Ch. R. 44.1 ("A party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice. The Court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under Rule 43. *The Court's determination shall be treated as a ruling on a question of law.*" (emphasis added)).

**45.** *Twin Bridges Ltd. P'ship*, 2007 WL 2744609, at *8 (citing Ct. Ch. R. 56(c)); *see also Banco de Credito Indus., S.A. v. Tesoreria Gen.*, 990 F.2d 827, 838 (5th Cir.1993), *cert. denied*, 510 U.S. 1071, 114 S.Ct. 877, 127 L.Ed.2d 73 (1994) ("The necessity of sifting through foreign law does not mitigate against the use of summary proceedings."); *In re Transamerica Airlines, Inc.*, 2007 WL 1555734 (Del.Ch. May 25, 2007) (granting summary judgment on questions of foreign law); *Kostolany v. Davis*, 1995 WL 662683, at *2 (Del.Ch. Nov. 7, 1995) ("Although the court may consider testimony, the issues of foreign law have been adequately developed by affidavit and argument. There is therefore no need to cause additional expense and delay by deposing the experts or bringing them to Delaware for a hearing on foreign law."); *Hiab Cranes & Loaders, Inc. v. Serv. Unlimited, Inc.*, 1983 WL 875126, at *1 (Del.Ch. Aug. 16, 1983) ("[T]he Court nonetheless finds no impediment to

judgment, however, is inappropriate where the nonmoving party has demonstrated a triable issue of fact or where the consideration of evidence would aid the court in reaching its decision.[46]

## B. Does Vichi Have Standing?

 Philips N.V. seeks to dismiss all of Vichi's claims because Vichi lacks standing. "Standing" refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance.[47] The issue of standing is concerned "only with the question of who is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy."[48] Generally, in order to have standing:

> (1) [The plaintiff must have] ... suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the

conduct complained of-the injury has to be fairly traceable to the challenged action of the [respondent] and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[49]

Court of Chancery Rule 17(a) provides that "[e]very action shall be prosecuted in the name of the real party in interest."[50]

 Here, Vichi bears the burden of demonstrating he has standing.[51] At the summary judgment stage, a party attempting to meet this burden may not rest on "mere allegations," but must " 'set forth' by affidavit or other evidence 'specific facts' which must be taken as true for purposes of the summary judgment motion."[52] "Summary judgment denying standing should be entered only if the allegations of injury are shams and the affidavits raise no genuine issues of fact."[53] "If the facts alleged to support an assertion of standing are controverted,

---

summary judgment, inasmuch as no factual inquiries exist and the inquiry presents purely a question of law."); 9A C. Wright & A. Miller, Federal Practice and Procedure § 2444 (3d ed. 2004) ("Once foreign law is ascertained to the judge's satisfaction, the court should proceed to decide the summary judgment motion as it would in any other context."); 9 J. Moore et al., Moore's Federal Practice § 44.1.05[3] (3d ed. 2012) ("Because under Rule 44.1 foreign law determinations are treated as questions of law, not questions of fact, a summary judgment is proper in a case involving a determination of foreign law.").

46. *See Judah v. Del. Trust Co.*, 378 A.2d 624, 631 (Del.1977) ("While matters of foreign law are determined as questions of law, it is entirely appropriate for the Trial Court to consider relevant evidence before reaching its decision.").

47. *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del.1991).

48. *Id.*

49. *Dover Historical Soc'y v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003) (citing *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 176 (3d Cir.2000)).

50. Rule 19(b) also provides that all necessary parties should be joined in a case.

51. *Dover Historical Soc'y*, 838 A.2d at 1109 ("The party invoking the jurisdiction of a court bears the burden of establishing the elements of standing.") (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

52. *Id.* at 1110 (quoting *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130).

53. *Paton v. La Prade*, 524 F.2d 862, 867 (3d Cir.1975) (citing *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)).

those facts must then be 'supported adequately by the evidence adduced at trial.' " [54]

Related to the issue of standing is the question of whether all indispensable parties are before the Court. Court of Chancery Rule 19(a) provides the test for determining those persons who are *necessary* parties:

> (a) ... A person who is subject to service of process and whose joinder will not deprive the Court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest....

Rule 19(b) addresses the related question of when a party will be deemed *indispensable:*

> (b) ... If a person as described in paragraph (a)(1) and (2) hereof cannot be made a party, the Court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable.

Rule 19(a) relates to a "person who is subject to service of process and whose joinder will not deprive the Court of jurisdiction over the subject matter of the action." If such a person fits the description of 19(a)(1) or (2), then that person is a necessary party and "shall be joined as a party in the action."

■ Rule 19(b) addresses the situation where a person who should be joined under the criteria of Rule 19(a) "cannot be made a party." If such a person cannot be joined, a court proceeds to consider a number of factors to determine whether that person would be regarded as "indispensable" and the action should be dismissed. Thus, a court should address the question of whether a party is indispensable only after it has concluded that the party is necessary.[55]

Philips N.V. alleges that Vichi has not met his burden to prove that he paid for or owned the Notes. Philips also contends that SIREF, Mivar, and Anna Maria Fabbri (Vichi's wife) are indispensable parties to this dispute, and, therefore, Vichi failed to include the real parties in interest.

In support of its arguments that Vichi lacks standing and that SIREF, Mivar, and Fabbri are indispensable, Philips N.V. points to portions of Vichi's deposition where he states: (1) that the Notes were purchased by SIREF and that SIREF was the official owner of the Notes through LPD's bankruptcy;[56] (2) that Fabbri owns 50% of the Notes;[57] and (3) that Mivar is

**54.** *Dover Historical Soc'y,* 838 A.2d at 1110 (quoting *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130).

**55.** *See, e.g., NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC,* 922 A.2d 417, 437 (Del. Ch.2007) ("Since Network, Alliance Network, and the other Alliance Network members are not necessary parties under Rule 19(a), it is unnecessary for the court to consider the defendants' Rule 19(b) analysis as to indispensability.").

**56.** Def.'s Opening Br. 23, 29 (citing Vichi Dep. 62–63, 71).

**57.** *Id.* at 31 (citing Vichi Dep. 166).

the party to which interest payments were due.[58]

Vichi, on the other hand, claims that he was the purchaser and is the sole owner of the Notes, and, thus, has standing. In that regard, Vichi has filed a sworn declaration that he personally made the loan of Q200 million, purchased the Notes, and owns the Notes.[59] In a sworn interrogatory response, Vichi stated that SIREF purchased the Notes "solely on Vichi's behalf."[60] Vichi also references a number of documents that allegedly evidence Vichi authorizing SIREF to purchase loans on his behalf and directing SIREF to transfer the Notes into his name.[61] Finally, Banca Agricola Mantovana, the holder of the Notes, certified that the "Notes are registered . . . in the name of Mr. Carlo Vichi."[62]

The arguments regarding Vichi's standing and the claimed absence of indispensable parties in this dispute are inextricably intertwined. Consequently, I address both arguments simultaneously as to Vichi and each of the three allegedly indispensable parties.

Beginning with SIREF, the evidence suggests that SIREF acts on behalf and at the direction of Vichi,[63] and, even by Philips N.V.'s account, SIREF is a trust company.[64] Hence, I perceive no substantial risk of Philips N.V. incurring double, multiple, or otherwise inconsistent obligations from Vichi and SIREF. Therefore, SIREF is not a necessary party.

Regarding whether Fabbri is a necessary party, Fabbri submitted a declaration stating that she "neither purchased nor owned the [N]otes" and that she does "not have any intention of pursuing a claim against Philips or anyone else concerning the Notes or the loan."[65] I accept and rely on Fabbri's Declaration, among other things, in deciding the standing issue here. As a result, Fabbri would be precluded, under the doctrine of judicial estoppel, from pursuing a claim on the Notes or the loan in the future.[66] Therefore, there is no

---

58. *Id.* (citing Vichi Dep. 59).

59. Vichi Decl. ¶ 16.

60. Pl.'s Resps. to Def.'s Second Set of Interrogs. & Third Req. for Produc. of Docs, Resp. to Interrog. 16.

61. Pl.'s Answering Br. 15–16 (citing Bradley Aff. Exs. 140, 141, 215).

62. Bradley Aff. Ex. 160. The machinations Vichi went through in terms of who held the Notes at various times to minimize his personal tax exposure and to achieve other ends, including increased privacy or confidentiality, are significant and reflect sophisticated planning. Based on that evidence, it is difficult to credit the protestations Vichi and his counsel make elsewhere as to Vichi's relative lack of financial and business sophistication in terms of his dealings with LPD and certain subsidiaries of Philips N.V. *See infra* Part II.E.1.

63. *See, e.g.,* Bradley Aff. Ex. 140 (Vichi: "I request that you sign in your name but on our behalf."); *id.* Ex. 141 (Vichi: "This notice shall serve to authorize you to enter into a securities-backed loan agreement according to the attached letter and with the usual conditions.").

64. *See* Def.'s Opening Br. 30 ("[A]t least according to SIREF's website, SIREF is an established Italian trust company.") (citing http://www.sirefid.it).

65. Decl. of Anna Maria Fabbri in Supp. of Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Fabbri Decl.") ¶¶ 34.

66. *See Capaldi v. Richards,* 2006 WL 3742603, at *2 n. 22 (Del.Ch. Aug. 9, 2006) ("Delaware requires both an inconsistent position and 'that the Court was persuaded to accept [it] as the basis for its ruling.'"); *Steinman v. Levine,* 2002 WL 31761252, at *11 (Del.Ch. Nov. 27, 2002) ("[U]nder the doctrine of judicial estoppel, a party may be precluded from asserting in a legal proceeding a position inconsistent with a position previously taken by

substantial risk of Philips N.V. being forced to re-litigate these claims with Fabbri in a later action.

■ As to Mivar's interest in the Notes, Vichi avers that the Notes merely were loaned to Mivar for a discrete period of time and that Mivar did not purchase or own the Notes.[67] Specifically, Vichi cites a document from Banca Agricola Mantovana which describes the transaction between Vichi and Mivar as a "securities-backed loan transaction."[68] In addition, Vichi alleges that at all relevant times, including when this action was brought, Vichi was the sole owner of the Notes.[69] Moreover, Vichi contends that even if he had brought suit earlier, while the Notes were on loan to Mivar, the risk of loss—and thus standing to seek legal redress for such loss—remained with Vichi.[70] Yet another factor reducing the possibility of Philips N.V. incurring double, multiple, or otherwise inconsistent obligations from Mivar and Vichi is the fact that Mivar has testified through its 30(b)(6) witness Necchi[71] that Mivar is owned almost entirely by SIREF and the Vichi family.[72] Thus, Mivar's interest is adequately represented in this litigation.

Vichi, therefore, has put forth affidavits and documentary evidence that, if accept-

ed, would support a finding that: (1) Vichi has standing; and (2) no other party is necessary or indispensable to this litigation. In other words, at least for purposes of defeating a motion for summary judgment, Vichi has met his burden to present competent evidence to support his standing.[73] Based on the contrary evidence put forth by Philips N.V., however, I conclude that it sufficiently controverts the allegations made by Vichi so as to demonstrate there are genuine issues of material fact on the question of standing. Therefore, at trial, Vichi must carry his burden to prove that, in fact, he has standing.[74]

## C. Are Vichi's Claims Time Barred?

Philips N.V. alleges that Vichi's claims for unjust enrichment (Count II) and fraud (Count VI) are time-barred by Delaware's three year period of limitations.

■ As a preliminary matter, "I note that in a court of equity, the applicable defense for untimely commencement of an action for an equitable claim is laches, rather than a statute of limitations."[75] Laches "operates to prevent the enforcement of a claim in equity if the plaintiff delayed unreasonably in asserting the claim, thereby causing the defendants to

him in the same or in an earlier legal proceeding.").

67. *See* Pl.'s Resps. to Def.'s Second Set of Interrogs. & Third Req. for Produc. of Docs. 3 (stating that the Notes were loaned to Mivar from July 9, 2002 to December 31, 2002, from December 31, 2002 to December 31, 2003, and from January 1, 2004 to March 13, 2006); Vichi Dep. 60 (acknowledging that the Notes were loaned to Mivar).

68. Bradley Aff. Ex. 182.

69. *See* Vichi Decl. ¶ 16; Necchi Decl. ¶ 25; Pl.'s Resps. to Def.'s Second Set of Interrogs. & Third Req. for Produc. of Docs. 3.

70. *See* Necchi Decl. ¶ 25.

71. *See* Necchi Dep. 95–96.

72. *Id.* at 49195.

73. *Dover Historical Soc'y v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003).

74. *Id.*

75. *Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063, at *13 (Del.Ch. Dec. 23, 2008) (citing *Whittington v. Dragon Gp. LLC*, 2008 WL 4419075, at *3 (Del.Ch. June 6, 2008)); *see also Reid v. Spazio*, 970 A.2d 176, 181–83 (Del.2009).

change their position to their detriment."[76] This doctrine "is rooted in the maxim that equity aids the vigilant, not those who slumber on their rights."[77] There are three generally accepted elements to the equitable defense of laches: "(1) plaintiff's knowledge that she has a basis for legal action; (2) plaintiff's unreasonable delay in bringing a lawsuit; and (3) identifiable prejudice suffered by the defendant as a result of the plaintiff's unreasonable delay."[78]

▮ The Court of Chancery generally begins its laches analysis by applying the analogous legal statute of limitations.[79] The time fixed by the statute of limitations is deemed to create a presumptive time period for purposes of the court's application of the equitable doctrine of laches absent circumstances that would make the imposition of the statutory time bar unjust.[80]

▮ In this case, the analogous statute of limitations under Title 10, Section 8106 of the Delaware Code for both unjust enrichment and fraud is three years.[81] In addition, Philips N.V. alleges that Vichi's Italian statutory law claim for fraud (Count VII) and Dutch law claim for breach of fiduciary duty (Count XI) are also subject to Delaware's three-year statute of limitations as a result of Delaware's borrowing statute.[82]

▮ In situations where a cause of action arises outside of Delaware but litigation is brought in Delaware, our courts look to Delaware's "borrowing statute" to determine the applicable limitations period. The borrowing statute provides that:

> Where a cause of action arises outside of [Delaware], an action cannot be brought in a court of [Delaware] to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of [Delaware], or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action.[83]

Philips N.V. does not allege that either Vichi's Italian law claim or Dutch law claim is subject to a limitations period of less than three years. Therefore, Delaware's three-year statute of limitations also applies to both of these claims.

▮ "[A] cause of action 'accrues' under Section 8106 at the time of the wrongful act, even if the plaintiff is ignorant of that cause of action."[84] As I noted at the motion to dismiss stage, the wrongful acts for fraud and breach of fiduciary duty stem from the inducement of Vichi to purchase the Notes, and the wrongful act

76. *Scureman v. Judge*, 626 A.2d 5, 13 (Del.Ch. 1992), *aff'd sub nom. Wilmington Trust Co. v. Judge*, 628 A.2d 85 (Del.1993).

77. *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del.1982).

78. *Whittington*, 2008 WL 4419075, at *3 (quoting *Tafeen v. Homestore, Inc.*, 2004 WL 556733, at *7 (Del.Ch. Mar. 22, 2004)).

79. *See, e.g., Adams*, 452 A.2d at 157; *Atlantis Plastics Corp. v. Sammons*, 558 A.2d 1062, 1064 (Del.Ch.1989).

80. *See U.S. Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996); *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del.Ch.1993).

81. *See* 10 *Del. C.* § 8106; *see also Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *38 (Del.Ch. Dec. 1, 2009).

82. 10 *Del. C.* § 8121; Def.'s Opening Br. 31–32.

83. 10 *Del. C.* § 8121.

84. *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del.2004).

for unjust enrichment stems from Philips N.V. obtaining the benefit of the proceeds of the Notes based on the alleged misrepresentations.[85] Therefore, the latest date that the allegedly wrongful acts could have occurred is July 9, 2002—the date Vichi actually purchased the Notes. Vichi, however, waited until November 29, 2006, over four years and four months after the claims accrued, to file his original complaint. Delaware law requires that where, as here, a "complaint asserts a cause of action that on its face accrued outside the statute of limitations," the plaintiff bears the burden of showing why the statute of limitations should be tolled.[86]

Vichi has presented three theories for tolling the statute of limitations: (1) Vichi's injuries were inherently unknowable; (2) Philips fraudulently concealed its misconduct; and (3) Vichi reasonably relied on Philips as a fiduciary. As Plaintiff, Vichi bears the burden of demonstrating that one of the tolling doctrines applies.[87] In evaluating Vichi's tolling arguments, I consider whether Vichi has adduced evidence "demonstrating a *plausible* ground" for his opposition to Philips N.V.'s motion for summary judgment on its affirmative de-

fense of laches beyond mere "allegations in the pleadings or conclusory assertions in affidavits."[88] I also consider whether "the record for summary judgment is incomplete or conflicting."[89]

### 1. Were Vichi's claims inherently unknowable?

 Vichi argues that the statute of limitations must be tolled "where it would be practically impossible ... to discover the existence of a cause of action."[90] At the motion to dismiss stage, I held that the analogous statute of limitations could be tolled with regard to Vichi's allegation "that Philips would back the Notes and support LPD" because Vichi may have had "a reasonable belief that Philips was, in fact, backing LPD such that LPD could repay the Notes."[91] Philips N.V., however, asserts that the evidence produced in discovery following the motion to dismiss makes clear that Vichi knew that Philips N.V. was not standing behind LPD's obligations in the way Vichi now alleges Philips N.V. promised it would.

In support of this contention, Philips N.V. cites the Offering Circular, which states that "[n]either Philips nor LGE is a

---

**85.** *Vichi*, 2009 WL 4345724, at \*39.

**86.** *Id.* (citing *Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063, at \*14 (Del.Ch. Dec. 23, 2008)).

**87.** *Winner Acceptance Corp.*, 2008 WL 5352063, at \*14 ("[T]he plaintiff has the burden of pleading facts leading to a reasonable inference that one of the tolling doctrines adopted by Delaware courts applies.").

**88.** *See Tafeen v. Homestore, Inc.*, 2004 WL 1043721, at \*1 (Del.Ch. Apr. 27, 2004) (emphasis added) ("[W]here the opponent of summary judgment has the burden of proof at trial, he must show specific facts demonstrating a plausible ground for his claim, and cannot rely merely upon allegations in the pleadings or conclusory assertions in affidavits in order to avoid summary judgment being granted in favor of the proponent of the

motion.") (internal quotation marks omitted); *see also Van de Walle v. Salomon Bros., Inc.*, 733 A.2d 312, 317 (Del.Ch.1998) ("[A] plaintiff seeking to toll.the statute of limitations must allege facts showing that he could not with reasonable diligence uncover the facts upon which the claim rests within [the relevant limitations period]."), *aff'd*, 734 A.2d 160 (Del.1999) (TABLE).

**89.** *See In re Asbestos Litig.*, 673 A.2d 159, 163 (Del.1996).

**90.** *Petroplast Petrofisa Plasticos S.A. v. Ameron Int'l Corp.*, 2011 WL 2623991, at \*16 (Del. Ch. July 1, 2011) (internal quotation marks omitted).

**91.** *Vichi*, 2009 WL 4345724, at \*44–46.

party or a guarantor to the Notes."[92] This evidence, however, is not dispositive because Vichi does not allege that Philips N.V. guaranteed the Notes, but rather that Philips N.V. represented that "it would support LPD as an entity, thus allowing LPD to repay the Notes."[93]

Vichi relies on several pieces of evidence as demonstrating that he could not have known that Philips N.V. would not stand behind LPD, until less than three years before he commenced this action. First, Vichi cites declarations by himself and Necchi that Philips N.V. reaffirmed its commitment to LPD in late 2003 or early 2004, which would fall within or be very close to falling within the relevant limitations period.[94] Vichi also points to LPD's 2003 Annual Report, filed on December 7, 2004, which stated that the restructuring of LPD included "additional equity of USD500 million provided by the Company's shareholders [Philips N.V. and LGE]."[95] The report further stated that LPD "would be able to meet its debts as they fall due and to adhere to loan covenant requirements," although it "may need to be re-financed by additional sources of funds," which Vichi took to mean its shareholder Philips.[96] Vichi alleges that he relied on these statements as providing further assurances that Philips N.V. would assist LPD in satisfying its obligations on the Notes.

Based on this evidence, I find that Vichi has presented a *plausible* ground for

claiming that he understood from Philips N.V. and LPD's representations that Philips N.V. was backing LPD such that LPD could repay the Notes, and that, therefore, Vichi's alleged injuries were inherently unknowable at the time of those representations. Because the latest of these "assurances" occurred on December 7, 2004, which is within the three-year statutory period that began on July 9, 2002, I deny Philips N.V.'s motion for summary judgment based on laches.[97]

### D. Are Vichi's Claims Barred by the Statute of Frauds?

Philips N.V., in its opening brief, raised a new affirmative defense that the Notes' choice of law clause[98] applied to Vichi's claims, and, therefore, that Vichi's claims for breach of an oral or implied contract fail under the English statute of frauds. Vichi objected to this defense as untimely. He argued that Philips N.V. has waived any statute of frauds defense by failing to plead it in its Answer or mention it in response to Vichi's contention interrogatories.[99] In response, Philips N.V. filed contemporaneously with its reply brief a motion to amend its Answer to add the statute of frauds as an affirmative defense. Vichi opposed that motion arguing that: (1) the defense would be futile; and (2) the amendment would cause prejudice to Vichi. Having considered the parties' submissions on the motion to amend, I conclude that the motion is well-founded.

---

92. Offering Circular at PNV0029833.

93. *Vichi*, 2009 WL 4345724, at *44–45.

94. *See* Vichi Decl. ¶ 14; Necchi Decl. ¶¶ 19, 21.

95. Bradley Aff. Ex. 41.4 at V00000351.

96. *Id.* at V00000352.

97. Having concluded that Vichi has presented a plausible argument that the running of the

limitations period was tolled because his injuries were inherently unknowable, I need not reach his other arguments for tolling the statute of limitations, *i.e.*, that Philips N.V. fraudulently concealed its misconduct and that Vichi reasonably relied on Philips as a fiduciary.

98. *See supra* note 21 and accompanying text.

99. Pl.'s Answering Br. 34–35.

Therefore, for the reasons summarized in an Order being entered concurrently with this Opinion, I grant Philips N.V.'s motion to amend to add a statute of frauds defense.

Furthermore, because the parties addressed the merits of the statute of frauds defense in the summary judgment briefing, I turn next to the merits of that defense. Specifically, I address: (1) whether the Notes' English choice of law clause applies; and, if it applies, (2) whether Vichi's claims are barred by the English statute of frauds.

### 1. Does the Notes' English choice of law clause apply to Vichi's claims?

 "Under general conflict of laws principles, the forum court will apply its own conflict of laws rules to determine the governing law in a case."[100] In that regard, "Delaware Courts will honor a contractually-designed choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction" and the jurisdiction's laws are not "repugnant to the public policy of Delaware."[101] "A mere difference between the laws of two states will not necessarily render the enforcement of a cause of action arising in one state contrary to the public policy of another."[102] Furthermore, where a choice of law provision is valid, the question of its *proper scope* is a question of that jurisdiction's law, as it turns on how the choice of law provision should be read.[103]

Here, both Vichi and Philips N.V. agree that the English choice of law clause is valid, but vigorously dispute the *scope* of that clause. There also is no dispute that the issue of "whether the choice of law clause in the Notes should be construed to govern the adjudication of Counts II, V, and VI should be judged under English law."[104] Thus, I will evaluate the applicability of the choice of law clause under English, rather than Delaware, law.

 As a preliminary matter, the parties dispute whether Defendant Philips N.V. was a party to the Notes. Relying on Vichi's statement that he "lent money to Philips through [LPD],"[105] Philips N.V. argues that "to the extent that English law governs claims against LPD that arise out of this transaction, English law also governs the fraud and oral contract claims against Philips N.V."[106] In other words, Philips N.V. seeks to estop Vichi from denying that Philips N.V. is a party to a contract related to the Notes. Vichi, however, openly admits that "Philips is not a party to the Notes."[107] Moreover, the Offering Circular explicitly states that "[n]either Philips nor LGE is a party or a guarantor to the Notes."[108] For summary judgment purposes, therefore, I consider whether under English law a choice of law clause could apply to a claim against a nonparty to the contract containing that clause in circumstances such as exist here.

100. *Tyson Foods, Inc. v. Allstate Ins. Co.,* 2011 WL 3926195 (Del.Super. Aug. 31, 2011).

101. *J.S. Alberici Const. Co. v. Mid–W. Conveyor Co.,* 750 A.2d 518, 520 (Del.2000).

102. *Id.*

103. *Weil v. Morgan Stanley DW Inc.,* 877 A.2d 1024, 1032 (Del.Ch.2005), *aff'd,* 894 A.2d 407 (Del.2005) (TABLE).

104. Pl.'s Answering Br. 36.

105. Vichi Dep. 21.

106. Def.'s Opening Br. 36 n.17.

107. Pl.'s Answering Br. 36.

108. Offering Circular at PNV0029833.

Vichi's expert witness, Mark Hapgood, Q.C., states that English law does not apply choice of law clauses in contracts to claims against persons who are not parties to those contracts.[109]

On the other hand, Philips N.V.'s expert witness, Bankim Thanki, Q.C., argues that "where a contract is governed by English law, claims which are closely connected with that contract, are also governed by English law." [110] According to Thanki, examples of claims closely connected with a contract include claims that: (1) defendant gave oral guarantees of contractual obligations; (2) following the making of material misrepresentations, the benefits received by a defendant from the contract should be rescinded; and (3) the contract was entered into as a result of a fraudulent misrepresentation.[111]

Neither declaration, however, adequately addresses the *specific* issue of whether a choice of law clause would apply to a claim against a *nonparty* to the contract in issue. Hapgood appears to answer that question in the negative, but he failed to substantiate his assertion that choice of law clauses will not bind nonparties by a citation to case law, treatises, or other relevant material. Similarly, Thanki's averments do not address explicitly whether a contractual choice of law provision applies to claims that are closely related to the contract and are being asserted against a *nonparty*.

▮▮▮▮ "[T]he party seeking the application of foreign law has the burden of not only raising the issue that foreign law applies, but also the burden of adequately proving the substance of the foreign law." [112] In this case, Philips N.V. seeks summary judgment based on its contention that English law would apply a contractual provision providing for the application of English law to a nonparty to the contract. Because Philips N.V. has not met its burden of adequately proving foreign law on that point, I decline to hold as a matter of law that the choice of law clause in the Notes applies to Vichi's claims. Moreover, the resolution of this question involves complicated questions of English law that would benefit from the expert testimony of both Hapgood and Thanki, a comprehensive analysis of English case law, and the "more highly textured factual setting of a trial." [113] The application of English law is a necessary predicate of Philips N.V.'s statute of frauds defense, but that issue remains undecided because there are disputed issues of fact and law regarding it. Therefore, I decline to grant summary judgment to either side based on the statute of frauds question.[114]

109. *See* Decl. of Mark Hapgood, Q.C. ("Hapgood Decl.") ¶¶ 8–9.

110. *See* Decl. of Bankim Thanki, Q.C. ("Thanki Decl.") ¶ 7.

111. *Id.*

112. *See Republic of Panama v. Am. Tobacco Co.*, 2006 WL 1933740, at *5 (Del.Super. June 23, 2006) ("Typically, the movant will submit enough 'relevant material' to the Court to sufficiently establish the content of foreign law."), *aff'd sub nom. State of Sao Paulo of Federative Republic of Brazil v. Am. Tobacco Co.*, 919 A.2d 1116 (Del.2007); *see also 9* J. Moore et al., Moore's Federal Practice, § 44.1.04[1] (3d ed. 2012) ("The party that wishes to rely on foreign law has the responsibility of demonstrating its content.").

113. *Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1239 n. 3 (Del.Ch.1987) (citing *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 257, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948)).

114. In a footnote, Philips N.V. argues that if Delaware substantive law applied to the claims—rather than English law, as it alleges—Vichi's claims also would be barred by the Delaware statute of frauds. Def.'s Opening Br. 40 n.21. In choosing which law to apply, however, "Delaware will apply the

### E. Do Vichi's Italian Law Claims Fail as a Matter of Italian Law?

Philips N.V. also alleges that even if Italian law, and not English law, governs Vichi's claims for breach of implied or oral contract (Count IV) and deceit by a third party and bad faith during contract negotiations (Count VII), those claims fail as a matter of Italian law.

#### 1. Vichi's Italian claim for breach of implied or oral contract

■ In Count IV of the Complaint, Vichi alleges that Philips N.V. represented that it would guarantee the repayment of the Notes through its support of LPD and Finance.[115]

According to Vichi's expert, under Italian law, a claim for breach of oral contract has the following elements: (1) a contract formed between the plaintiff and the defendant; (2) the defendant failed to exactly render due performance; (3) the defendant's nonperformance was not the result of impossibility of performance due to a cause which cannot be imputed to the defendant; and (4) damages.[116]

Philips N.V.'s primary argument in support of granting summary judgment on this claim is that Albertazzi and Golinelli were not employees of Philips N.V. and, thus, only could have bound Philips N.V. under an agency theory. According to

Philips N.V., Vichi has presented no evidence from which the Court reasonably could infer that Philips N.V. authorized Albertazzi or Golinelli to make financial commitments on its behalf.

The doctrine of agency under Italian law is set out in Article 1388 of the Italian Civil Code. Article 1388 requires: (1) that some representative power is conferred on the agent; (2) that the agent complies with the limits of the power conferred upon him; (3) that the agent acts in the interests of the principal; and (4) that the agent uses the principal's name.[117] Vichi has not presented facts that would support a reasonable inference that he dealt with someone who had actual authority to bind Philips N.V. to a contract. In that regard, Vichi does not allege, for example, that Albertazzi and Golinelli were employees of Philips N.V. Instead, he relies on the doctrine of apparent authority.

According to Vichi's expert witness, to establish apparent authority a claimant must prove that: "(i) the apparent agent has acted in the name of the principal; (ii) the principal negligently created or tolerated the situation whereby the plaintiff could reasonably believe the agent to be authorized by the principal; and (iii) the plaintiff's belief that the apparent agent was the principal's agent and was authorized to enter the agreement is reason-

---

Statute of Frauds provisions of the State where the contract is made in determining the validity of the contract." *Dweck v. Nasser,* 2010 WL 972780, at *1 (Del.Ch. Mar. 10, 2010) (citing *Dietrich v. Tex. Nat'l Petrol. Co.,* 193 A.2d 579, 584 (Del.Super.1963)). Vichi alleges that the contract was formed in Italy. Therefore, even if Delaware law applied, the Delaware statute of frauds would not govern the contract-related claims in issue.

**115.** Compl. ¶ 174. Vichi has since disavowed claiming that this was a guarantee, and now asserts that Philips promised and represented

that it would stand behind LPD so that LPD would be in a position to repay the loan. *See* Tr. 54 ("We are not pursuing a claim for a guarantee, as we have said in the papers.").

**116.** Declaration of Pietro Trimarchi ("Trimarchi Decl.") ¶ 10 (citing Codice Civile [C.c] arts. 1218, 1321(It.)). Philips N.V.'s expert's formulation comports with Vichi's. *See* Declaration of Andrea Bernava, dated July 23, 2012 ("Bernava Decl") ¶ 9.

**117.** Bernava Decl. ¶ 10 (citing Codice Civile [C.c] art. 1388(It.)).

able."[118]

Vichi contends that he has met the three requirements of apparent authority, or, "[a]t the very least, material issues of disputed fact foreclose a grant of summary judgment" against him.[119] Vichi has presented evidence regarding the first element of apparent authority that conceivably could support a finding that, at times, Albertazzi and Golinelli acted in Philips N.V.'s name.[120] Thus, there is a genuine issue of material fact on that question. Having carefully considered the record before me and the legal authorities presented, however, I conclude that Vichi has not adduced sufficient evidence to support either the second element of apparent authority, that Philips N.V. created or tolerated a situation whereby Vichi reasonably could believe Albertazzi or Golinelli were authorized to bind Philips N.V. to stand behind LPD to such an extent that Vichi could be assured that his 200 million loan would be repaid, or the third element of apparent authority, that such a belief by Vichi was reasonable.

### a. Element (ii) of apparent authority

Both Albertazzi and Golinelli were originally employees of Philips Italia, and ultimately became part of the LPD sales organization. Although they continued to be employed by Philips Italia, their salaries were reimbursed by LPD. The employment by LPD and Philips Italia, however, does not create a situation whereby Vichi reasonably could have believed that Albertazzi and Golinelli were authorized by Philips N.V. to enter into a binding contract whereby Philips N.V. undertook financially to support LPD unconditionally.

Instead, Vichi relies on evidence that Philips held out LPD to the relevant public as part of "One Philips."[121] For example, Vichi emphasizes that Philips N.V. created the "One Philips" program with the aim of creating a "company of acting parts acting as one."[122] Vichi further alleges that Philips N.V. created the impression that Philips N.V. and LPD were "one" by intimately involving itself in the affairs of LPD.[123] In that regard, Vichi points to Philips N.V.'s involvement in, among other things, LPD's human resources, information technology, legal, accounting, and security operations.[124]

Vichi effectively asks this Court to disregard the corporate formalities attendant to the organization of the far-flung Philips family of companies based on the fact that Philips "acted and operated through a net-

---

118. Trimarchi Decl. ¶ 23; *accord* Bernava Decl. ¶ 13 ("Apparent authority exists where: (i) the false representative (*"falsus procurator"*) has acted in the name of the represented person, which means that he has introduced himself as a representative of the false principal; (ii) the conduct of the false principal is responsible for the third party's belief that the *falsus procurator* was duly authorized; (iii) such conduct was negligent, *i.e.*, the fault of the false principal, and caused the reasonable belief of the other party that authority had been validly and effectively given to the *falsus procurator;* and (iv) the party who concluded the contract with the *falsus procurator* assumed in good faith that the *falsus procurator* was duly authorized.").

119. Pl.'s Answering Br. 45.

120. *See, e.g.,* Vichi Decl. ¶ 12 ("Albertazzi assured me that he was still 100% Philips and that the deal would be with Philips through LPD."); Bradley Aff. Ex. 128 (Golinelli: "You know that anyway I've a Philips business card."); Coates Decl. ¶ 19 ("I can recall Messrs. Albertazzi and Golinelli describing the loan as involving a deal between Mr. Vichi and Philips.").

121. Pl.'s Answering Br. 47–50.

122. Bradley Aff. Ex. 36.1 at Ex. 10(b) at 11.

123. Pl.'s Answering Br. 52.

124. *See* Bradley Aff. Ex. 48.

work of subsidiaries" and employed a corporate philosophy or slogan of "One Philips." [125] As this Court has noted before, "Delaware courts take the corporate form and corporate formalities very seriously ... [and][t]his Court will disregard the corporate form only in the 'exceptional case.' " [126] While the "One Philips" concept may reflect a marketing program or corporate philosophy that Philips touted as part of an effort to create a unified company, Vichi has not presented evidence sufficient to support a reasonable inference that it was meant to eradicate the corporate structure of Philips N.V. and its subsidiaries. In particular, the evidence proffered by Vichi is insufficient to support a reasonable inference that an employee of Philips Italia and LPD had authority to bind Philips N.V. to a contract as alleged by Vichi.

#### b. Element (iii) of apparent authority

Moreover, Vichi's claim that he *"reasonably believed* that Albertazzi and Golinelli ... were authorized to enter into an agreement on [Philips N.V.'s] behalf" of the kind he alleges is unfounded.[127] Even accepting the evidence presented by Vichi and drawing all inferences in his favor, it is not plausible that a sophisticated investor such as Vichi reasonably could have believed that either Albertazzi, Golinelli, or

both of them could have bound Philips N.V. to such a commitment. A sophisticated businessman such as Vichi would have understood that two salespeople for a subsidiary of Philips N.V. could not orally bind Philips N.V. to a commitment of at least Q200 million.

Vichi's counsel denies that the evidence demonstrates that Vichi is "a sophisticated player." [128] Vichi, however, is a wealthy individual who founded and managed for decades a major company. He also is surrounded by competent legal and financial advisors, including in this case Necchi, Allen & Overy, and MPS Finance. Indeed, Vichi, through his advisors, structured the Notes at issue here so as to reduce his tax obligations and ensure financial secrecy, all while maintaining "full compliance" with Italian laws.[129] Moreover, as noted in the standing section, *supra,* Vichi sometimes personally directed SIREF and others as to the movement of funds related to the LPD loan. The Court of Chancery consistently has treated parties in similar or even less compelling circumstances to be "sophisticated." [130]

I also find unpersuasive Vichi's protestations that he is not a sophisticated party because he was not represented by counsel

---

125. Pl.'s Answering Br. 47.

126. *Case Fin., Inc. v. Alden,* 2009 WL 2581873, at *4 (Del.Ch. Aug. 21, 2009).

127. *See* Pl.'s Answering Br. 53 (emphasis added).

128. Tr. 65–66; *see also* Pl.'s Answering Br. 54 n.26 ("Vichi has never taken classes in business or finance, was not a finance expert, and kn[e]w[ ] little about financial matters.") (citations and internal quotation marks omitted).

129. *See* Vichi. Dep. 64–65. In structuring the Notes, Vichi relied on a tax consultant, among others. *Id.*

130. *See, e.g., PNC v. Sills,* 2006 WL 3587247 (Del.Super. Nov. 30, 2006) (finding defendant individuals competent based on their access to competent counsel); *Homan v. Turoczy,* 2005 WL 5756927, at *6 (Del.Ch. Aug. 12, 2005) (plaintiffs had experience as executives and were advised by an accountant); *All Pro Maids, Inc. v. Layton,* 2004 WL 3029869, at *3 (Del.Ch. Dec. 20, 2004), *aff'd,* 880 A.2d 1047 (Del.2005) (TABLE) (considering the assistance of counsel in determining sophistication).

in the Notes transaction.[131] Vichi's argument elevates form over substance. Necchi, a financial and legal advisor to Vichi and Mivar, indisputably employed the services of MPS Finance, who used lawyers at Allen & Overy.[132] Vichi contends that MPS Finance was limited to the role of "arranger." This hairsplitting is a mere distraction and is immaterial for purposes of the pending motion. Therefore, Vichi should not be able to use his personal decision not to obtain the advice of counsel to argue he is unsophisticated. It was his choice not to be represented by counsel in his personal capacity, and he must abide by the consequences of that decision.

Vichi, therefore, cannot rely on his status as a "simple man" to reduce the standard for reasonableness applicable to his alleged belief that Albertazzi or Golinelli had the apparent authority to bind Philips N.V. to a major and ill-defined financial commitment regarding LPD.

Furthermore, the reasonableness requirement in elements (ii) and (iii) of apparent authority is one of objective reasonableness.[133] Consequently, the reasonableness requirement would include not only what Vichi knew, but also what Vichi should have known. Hence, even assuming Vichi and Necchi did not know about the statements in the Offering Circular, as they claim, they still are charged with constructive knowledge of the information in it. The Offering Circular related to Vichi's ability to trade publicly the Notes. Indeed, in December 2002, Vichi instructed SIREF to sell Q5 million of the Notes on the Luxembourg Exchange to an unknown buyer for purposes of valuing his holding in the Notes.[134] The Offering Circular made clear that "[n]either Philips nor LGE is a party or a guarantor of the Notes."[135] Nevertheless, under Vichi's theory, Albertazzi and Golinelli promised, on Philips N.V.'s behalf, that Philips would ensure that Vichi's Notes were repaid. In that regard, Vichi concedes that Philips did not guaranty the Notes. Instead, he claims that the promise to ensure repayment exposed Philips to *primary* liability in the nature of indemnification.[136] Such an obligation, however, appears to be inconsistent with Philips N.V.'s refusal to guaranty the Notes contained in the Offering Circular. Vichi had constructive knowledge of that refusal. Therefore, I find unreasonable Vichi's professed belief that Albertazzi or Golinelli, two salespersons employed by Philips Italia or LPD, orally could have bound Philips N.V. to an even greater obligation.

131. See Tr. 66–67 ("Mr. Vichi is not a sophisticated player. Mr. Vichi was not ... represented in all aspects of this transaction by MPS Finance or Allen & Overy. Allen & Overy did not represent Mr. Vichi. Mr. Vichi has never met or spoken to Allen & Overy, and there is no evidence Mr. Necchi did."); Pl.'s Answering Br. 8 (citing Nechi Decl. ¶ 17).

132. Necchi Decl. ¶¶ 16, 17.

133. *See* Bernava Decl. ¶ 15 ("The 'good faith' requirement of apparent authority requires a Plaintiff to demonstrate that his assumption of the *falsus procurator's* authority was reasonable under the circumstances. In other words the Plaintiff must prove that, exercising ordinary care, he had no reason to doubt that effective and valid power and authority had been granted to the *falsus procurator*").

134. Pl.'s Resps. to Def.'s Second Set of Interrogs. & Third Req. for Produc. of Docs., Resp. to Interrog. 16.

135. Offering Circular at PNV0029833.

136. *See* Pl.'s Answering Br. 40 ("Instead, this was an original promise that exposed Philips to primary liability: had this promise been fulfilled, there could never have been a default by LPD that could have triggered any secondary liability.").

In summary, after full discovery, Vichi has failed to adduce sufficient evidence to support a reasonable inference that he has demonstrated the existence of either element (ii) or element (iii) of apparent authority. Because apparent authority is a necessary predicate of Vichi's Italian law claim for breach of oral contract, Philips N.V. is entitled to a dismissal of that claim with prejudice.[137]

## 2. Vichi's Italian law claim for deceit by a third party and bad faith during contract negotiations

Philips N.V. also moves for summary judgment on Vichi's Italian fraud claim for deceit by a third party and bad faith during contract negotiations (Count VII). These claims are premised on three Italian Civil Code provisions: Articles 1439, 2043, and 1337.[138] Philips N.V. alleges that all three of these provisions require a showing that it is vicariously liable for the acts of Albertazzi and Golinelli, and that Vichi has not proven the necessary elements of vicarious liability.

The parties agree that to succeed at trial Vichi must prove vicarious liability because Articles 1439, 2043, and 1337 do not independently "impose liability vicariously on one person for the acts of another."[139] Article 2049 of the Italian Civil Code describes the concept of vicarious liability as follows: "Masters and employers are liable for damage caused by the tortious conduct of their servants and employees committed within the course and scope of the performance of their tasks."[140]

According to Vichi, Article 2049 also would impose liability on a company for the acts of persons, such as Albertazzi and Golinelli, who may not have entered into an employment contract, but are engaged in performing a task within the frame of the entrepreneurial organization subject to the master's implicit or indirect authorization and control.[141] Philips N.V.'s expert on Italian law, Bernava, does not disagree. Bernava states that "[t]he case law has interpreted Article 2049 to include liability for persons who may not be employees but who have been assigned a task by the principal and committed an unlawful act, causing damage, while performing that task."[142] Bernava asserts, however, that even if the plaintiff proves that the task was assigned by the master, the defendant is not liable if the conduct in question was extraordinary and outside any foreseeable activity related to the execution of the task.[143] Thus, according to Philips N.V., Vichi must demonstrate: (1) that Philips N.V. authorized Albertazzi or Golinelli to make representations on its behalf; and (2) that Albertazzi or Golinelli's actions were foreseeable and not extraordinary.

---

137. Similar conclusions may apply to Count V, *i.e.*, Vichi's claim for breach of oral or implied contract under Delaware law. Neither party addressed those issues in their principal briefs, however, and Philips only mentioned it tangentially in a footnote in its reply brief. Therefore, I do not consider the viability of Count V ripe for decision at this time.

138. *See* Compl. ¶¶ 198–207 (citing Codice Civile [C.c] arts. 1439, 2043, 1337(It.)).

139. Trimarchi Decl. ¶ 38 ("[Mr. Bernava] says that Articles 1439, 2043 and 1337 of the Italian Civil Code do not 'impose liability vicariously on one person for the acts of another.' That is *true* as far as it goes, but it does not mean that a servant cannot bind his master (as discussed below).").

140. *Id.* ¶ 39 (citing Codice Civile [C.c] art. 2049(It.)); *accord* Bernava Decl. Ex. 2, Codice Civile [C.c] art. 2049(It.).

141. Pl.'s Answering Br. 54 (citing Trimarchi Decl. ¶¶ 39–40).

142. Bernava Decl. ¶ 19.

143. *Id.*

Vichi's expert, on the other hand, avers that "the case law . . . does not apply . . . a foreseeability test." [144]

Although Bernava states that "case law has interpreted" Article 2049 to require a showing that the challenged conduct was extraordinary or unforeseeable, he has not supported this requirement with cases, treatises, or other relevant material. As noted previously, "the party seeking the application of foreign law has . . . the burden of adequately proving the substance of the foreign law." [145] For purposes of Philips N.V.'s motion for summary judgment, therefore, this aspect of Italian law remains in dispute.

 In addition, under Vichi's expert's formulation of the law, there are genuine issues of material fact concerning whether Albertazzi and Golinelli represented to Vichi that LPD was strong and that Philips would stand behind it, and whether those statements were made with the implicit or indirect approval of Philips N.V. Both Golinelli and Necchi have filed declarations stating that Vichi and Necchi were told that LPD was a strong company with a bright future and that Philips N.V. would stand behind LPD.[146] In regard to whether those statements were made with the implicit or indirect approval of Philips N.V., Vichi has presented evidence that Philips N.V. had knowledge of the loan,[147] and, perhaps, had knowledge of these statements,[148] yet did nothing to correct the mistaken belief they allegedly caused Vichi to have. Philips N.V. disputes these points and has presented evidence that arguably supports a contrary finding. For example, the Offering Circular could be considered an act by Philips N.V. to avoid a mistaken belief, such as Vichi's.

Philips N.V., therefore, has not carried its burden of demonstrating foreign law for purposes of Court of Chancery Rule 44.1 as it relates to Count VII. There also are genuine issues of material fact as to whether the alleged statements were made and were within the scope of Philips N.V.'s authorization. Accordingly, I refuse to grant summary judgment on Vichi's Italian claim for deceit by a third party and bad faith during contract negotiations (Count VII).

### F. Does Vichi's Fiduciary Duty Claim Fail as a Matter of Dutch Law?

In the Complaint, Vichi added Philips N.V. as a defendant on a claim for breach of fiduciary duty under Dutch Law (Count XI). Philips N.V. seeks summary judgment on this claim because: (1) Vichi has not demonstrated that Philips was aware that LPD *would not* satisfy its obligations to the creditor (Vichi), as they assert is required by Dutch law; and (2) Vichi and his advisors were warned of LPD's financial position, which Philips asserts precludes Vichi from recovering under Dutch law.[149] For his part, Vichi disagrees with

---

144. Trimarchi Decl. ¶ 42.

145. *See Republic of Panama v. Am. Tobacco Co.*, 2006 WL 1933740, at *5 (Del.Super. June 23, 2006), *aff'd sub nom. State of Sao Paulo of Federative Republic of Brazil v. Am. Tobacco Co.*, 919 A.2d 1116 (Del.2007); *see also supra* note 112 and accompanying text.

146. *See* Golinelli Decl. ¶¶ 37, 43; Necchi Decl. ¶ 11.

147. *See, e.g.,* Bradley Aff. Ex. 59 at PNV0027474, Ex. 198 at PNV000469.

148. *See id.* Ex. 167 at PNV0029121 (Coates to superiors within Philips: "I do not think it was my fault that I couldn't make [others] better understand the level of 'sensitivity' of this problem, because I told several times *at many level[s]* to Semi [*i.e.,* Philips Semiconductors, a Philips N.V. subsidiary] people in the past." (emphasis added)).

149. Def.'s Opening Br. 44–46; Def. Koninklijke Philips Elecs., N.V.'s Reply Br. in Supp. of Its Mot. for Summ. J. ("Def.'s Reply Br.") 30–36.

Philips N.V.'s interpretation of Dutch law, and argues that determining liability on his Dutch law claim requires a fact-intensive inquiry that can only be accomplished at trial.

The parties generally agree on the requirements for shareholder liability to a corporate creditor under Dutch law. Vichi and Philips N.V.'s expert witnesses recognize that as a general rule a shareholder of a corporation is not personally liable for acts performed in the name of the company unless such duties are specifically enumerated in the Articles of Association of that corporation.[150] In certain cases, however, Dutch courts have held shareholders liable to a company's creditors under the Dutch doctrine of "unlawful act," which applies when: (1) the shareholder is intensely or intimately involved with the company ("intimate involvement"); (2) the shareholder knew or reasonably should have known that it was likely that the company would not be able to satisfy its obligations to the creditor ("knowledge"); and (3) the shareholder fails to take measures that could have prevented the creditor's losses ("duty of care").[151]

### 1. The intimate involvement requirement

The first question, therefore, is whether or not Philips N.V. was intimately involved in the affairs of LPD. Philips N.V. notes that nearly all of the cases in which Dutch courts have applied the doctrine of "unlawful act" involve a 100% shareholder that exercised dominant control.[152] Vichi counters that 100% ownership is not a requirement because shareholders with less than 100% ownership have been found liable for breaching their duties to creditors under Dutch law.[153] In fact, at least one Dutch court has found liability as to a shareholder with an interest of between 66.4% and 71.5%.[154] Rather than merely looking at the percentage ownership, "the focus under Dutch law is involvement and control."[155]

According to Vichi, when determining involvement and control, Dutch courts examine whether the shareholder exerted a strong influence over the policies of the company, whether the shareholder was extensively involved in the financial affairs of the company, whether the company relied upon the shareholder for existence, and whether the shareholder had taken efforts to inspire confidence in the company.[156] Vichi presents plausible evidence of each of these factors, citing, among other things, the composition of the supervisory board of LPD, Philips N.V.'s role in organizing financing for LPD, Philips N.V.'s role as a key customer, and alleged assurances representatives of Philips N.V. gave to Vichi.[157] Because the determination of "intimate involvement" is a fact-intensive

---

150. *See* Decl. of Harm–Jan de Kluiver ("de Kluiver Decl.") ¶¶ 17, 18; Decl. of Gerard van Solinge ("van Solinge Decl.") ¶ 33 (both citing Burgerlijk Wetboek [Dutch Civil Code], bk. 7, art. 2:175 (Neth.)).

151. van Solinge Decl. ¶¶ 34–35; de Kluiver Decl. ¶¶ 18–21; Decl. of Geert T.M.J. Raaijmakers ("Raaijmakers Decl.") ¶ 10.

152. Def.'s Opening Br. 44 (citing de Kluiver Decl. ¶ 20).

153. Pl.'s Answering Br. 55 (citing van Solinge Decl. ¶ 54).

154. Rb. Utrecht, 12 december 2007, JOR 2008, 10 (Ceteco) ¶ 2.5 (Neth.).

155. *See* van Solinge Decl. ¶ 54 (citing van Solinge Treatise at 2–4); *accord* Raaijmakers Decl. ¶¶ 14–15.

156. Pl.'s Answering Br. 56 (citing van Solinge Decl. ¶¶ 38–41).

157. *Id.*

inquiry, and Vichi has presented facts that plausibly could support a finding of intimate involvement, Vichi has satisfied the element of "intimate involvement" for purposes of avoiding Philips's motion for summary judgment.

## 2. The knowledge requirement

■ The second element of an "unlawful act" claim is whether the shareholder knew or reasonably should have known that it was likely that the company would not be able to satisfy its obligations to the creditor. The "knowledge" element involves three separate inquiries. As a threshold matter, the Court must discern the meaning of the phrase "not be able to satisfy its obligations to creditors." The Court then must determine the reference date (*peildatum*), which refers to the date that the shareholder knew or reasonably should have known that the company would not be able to fulfill its obligations. Finally, the Court should determine whether the facts suggest that, as of the reference date, Philips N.V. had knowledge that LPD would not be able to satisfy its obligations to creditors, as that phrase has been construed by the Courts.

As to the first inquiry, Philips N.V. contends that the requisite knowledge is such that "the shareholders must have known that the company's financial situation was 'so poor that [the company] no longer had any real chance of survival.'"[158] Vichi, on the other hand, advances a lower standard that simply requires knowledge that it was "likely" that the company would not be able to repay its creditors.[159] In determining the correct standard, I reiterate that foreign law is a question of law that can be determined at the summary judgment stage.[160]

Both de Kluiver and van Solinge rely heavily on a decision by the Supreme Court of the Netherlands in *Sobi/Hurks II*.[161] In that case, the court held that "a serious fear of insolvency" was an "incorrect measuring stick" for determining an "unlawful act."[162] The correct standard, according to the Supreme Court of the Netherlands, is "if the parent company can know or ought to know that the subsidiary is not in a position to fulfill its obligations."[163] The court also stated that the standard for "requisite knowledge" of the director defendant in the *Sobi/Hurks II* case was *not* "that he knew that it was highly unlikely that the creditors of a subsidiary could be satisfied," but rather "it is required that he knew or should have known that the subsidiary would not pay its debts or would not pay them within a reasonable time."[164]

Vichi's expert, van Solinge, relies on the *Beklamel* case for his opinion that "[t]he 'knew or should reasonably have known' standard can be satisfied by a director's actual or inferred knowledge that the company *will likely* not be able to satisfy its creditors."[165] The translation of *Beklamel* provided as an exhibit to van Solinge's declaration, however, states that the

**158.** Def.'s Opening Br. 44–46 (citing de Kluiver Decl. ¶¶ 29, 31).

**159.** Pl.'s Answering Br. 57 (citing van Solinge Decl. ¶¶ 43, 46).

**160.** *See supra* notes 44–45 and accompanying text.

**161.** HR 21 december 2001, JOR 2002, 38 (Sobi/Hurks II) (Neth.).

**162.** *Id.* ¶ 5.3.4.

**163.** *Id.*

**164.** *Id.* ¶ 5.4.7.

**165.** van Solinge Decl. ¶ 44 (citing HR 6 oktober 1989, NJ 1990, 286 (Beklamel) (Neth.)) (emphasis added).

knowledge requirement concerns whether the shareholder "could not, or could not within a reasonable time, meet its obligations."[166] Moreover, van Solinge's own treatise states that the *Sobi/Hurks II* standard—applying the *Beklamel* norm—is whether the subsidiary "knew or ought to have known" that "the subsidiary cannot meet its obligations towards the creditors."[167] I conclude, therefore, that the issue in terms of knowledge is whether or not Philips N.V. knew or should have known that LPD would not be able to meet its obligations to creditors, and not the "likely" standard set forth by van Solinge.

The second part of the inquiry regarding the knowledge element of an "unlawful act" claim involves determining the reference date by which Philips N.V. knew or reasonably should have known that LPD would not be able to fulfill its obligations. In that regard, it is useful to review some of the important dates in this matter. LPD was formed on June 30, 2001. On May 31, 2002, Philips N.V. and LGE infused $250 million—$125 million each—into LPD. The Notes were purchased on July 9, 2002. Finally, on January 27, 2006, LPD filed for bankruptcy and ceased making payments on the Notes.

Vichi contends the reference date for the requisite knowledge should be set at or before the closure of the Vichi loan.[168] To succeed in proving his claim for breach of fiduciary duty under Dutch law, therefore, Vichi must prove that on or before July 9, 2002, Philips N.V. knew or should have known that LPD had no reasonable prospect of survival.

Philips N.V., on the other hand, asserts that no Dutch court would ever impose liability based on such an early reference date. As de Kluiver noted:

> I am for example not aware of any relevant case law—and such case law is not cited by [Vichi's expert]—in which a Dutch court determined a reference date 3.5 years prior to the opening of insolvency proceedings.... Generally, reference dates are determined at points in time very close to the opening of insolvency proceedings with respect to the relevant company (*i.e.* a couple of month[s], weeks or even days).[169]

Both Vichi and Philips N.V. cite to the *Ceteco* case in support of their conflicting contentions regarding the outer limits of reference dates.[170] According to Vichi's expert, the reference date in *Ceteco* was thirty-three months before the company's collapse.[171] Philips N.V.'s expert, however,

---

**166.** HR 6 oktober 1989, NJ 1990, 286 (Beklamel) ¶ 3.2 (Neth.).

**167.** de Kluiver Decl. Ex. D ("van Solinge Treatise") 2.

**168.** van Solinge Decl. ¶ 55 ("[I]t is necessarily my opinion that Philips knew or should reasonably have known that it was likely that LPD would not fulfill its obligations to its creditors, and that the reference date for such knowledge would be set at or before the closure of the Vichi loan.").

**169.** *See* Decl. of Harm–Jan de Kluiver, dated August 23, 2012 ("de Kluiver Supplemental Decl.") ¶ 23; *see also* Raaijmakers Decl. ¶ 28 ("[T]he time span between the date of the loan and the bankruptcy of LPD would also

be seen as an independent fact precluding 'after the reference date' liability in this case. This is a period of well over three years.").

**170.** *See* Rebuttal Report of van Solinge ("van Solinge Rebuttal") ¶ 29 (citing Rb. Utrecht 12 december 2007, JOR 2008, 10 (Ceteco) (Neth.)); Raaijmakers Decl. 11 n.27 (same).

**171.** van Solinge Rebuttal ¶ 29. Vichi's expert also relies on the *Comsys* case, in which he asserts *no* reference date was fixed by the Court. *Id.* ¶ 29 (citing HR 11 September 2009, JOR 2009, 309 (Comsys) (Neth.)). The facts and reasoning for not fixing a reference date in *Comsys*, however, are distinguishable from the case at hand. In *Comsys*, the Supreme Court of the Netherlands chose not to

states that the date in the *Ceteco* ruling was "23 months prior to the suspension of payments."[172] The question, therefore, is whether the reference date should be measured from the date payments on the debt were suspended or the date that the company collapsed or filed for bankruptcy.

The court in *Ceteco* awarded damages in the form of "repayment of debts," which included payments for the period between the suspension of payments and the declaration of bankruptcy.[173] Using the suspension of payments date to fix the reference date recognizes that the losses suffered by the creditor derive from the suspension of payments, rather than the bankruptcy itself. Effectively acknowledging this fact, Vichi avers that "[a]s a result [of the bankruptcy], LPD could not repay the Loan, and Vichi has suffered a loss."[174] In *Ceteco*, the Rechtbank Utrecht (the Utrecht District Court) relied on the more significant suspension of payment date and set a reference date of 681 days before that date. Both parties recognize *Ceteco* as representing an outer limit of sorts for reference dates.

Here, Vichi asks this Court to set a reference date 1,298 days before the bankruptcy and subsequent cessation of payments to Vichi. Yet, "[t]his court's duty is to apply existing, not to develop new, Dutch law."[175] To nearly double the longest reference period ever established by a Dutch court in the circumstances of this case would be creating new Dutch law, and not applying existing Dutch law.

The numerous payments by LPD to Vichi and the equity injections by Philips N.V. reinforce the conclusion that a Dutch court would be unwilling to find liability under the "unlawful act" doctrine in this case. Philips N.V.'s expert de Kluiver stated that:

> I am not aware of any relevant case law—and such case law is not cited by Prof. van Solinge—in which a Dutch court determined a reference date prior, let alone more than 1.5 years prior, to a financial restructuring of the company in which the shareholders made significant equity contributions.[176]

Philips N.V.'s expert Raaijmakers also opined:

> [T]hat Philips N.V. (and its co-shareholder LG) made very large equity injections (exceeding the amount of the loan in question) to LPD in 2002 and 2004 (without any security for its own benefit), just prior to and after the loan of Mr. Vichi, would be viewed as dispositive of this issue by a Dutch court.... The fact that LPD serviced its debt on the notes at issue for over three years from the date of issuance also makes it exceedingly improbable that any Dutch court would find liability in these circumstances.[177]

---

set a reference date because the situation existed *ab initio*, *i.e.*, at the establishment of the company. HR 11 September 2009, JOR 2009, 309 (Comsys) ¶ 5.2.1 (Neth.). Here, Vichi does not allege that Philips N.V. knew or should have known that LPD had no reasonable prospect of success when LPD was established. Therefore, I conclude that this case differs from *Comsys* and that it will be necessary to fix a reference date.

172. Raaijmakers Decl. ¶ 23.

173. Rb. Utrecht 12 december 2007, JOR 2008, 10 (Ceteco) ¶ 10 (Neth.).

174. Pl.'s Answering Br. 10 (citations omitted).

175. *Kostolany v. Davis*, 1995 WL 662683, at *4 (Del.Ch. Nov. 7, 1995).

176. de Kluiver Supplemental Decl. ¶ 24.

177. Raaijmakers Decl. ¶ 23.

Vichi's Dutch law expert van Solinge points out that in *Comsys*[178] the Court found liability under the "unlawful act" doctrine despite multiple equity injections by the parent company.[179] As previously noted,[180] however, the *Comsys* case involved a unique set of facts that make it distinguishable from the present case. The court described the corporate structure in *Comsys* as follows:

> [A] situation existed since 1999 in which Holding as a parent company and controller of Comsys and Services had set up this part of its company in such a way that Comsys and Services were a single company, with the cost side being part of Services and the income side being part of Comsys, while the costs incurred by Services on behalf of Holding and Comsys were not passed on in full. Consequently Services ran at a loss since 1999 and could only fully meet its debt obligations with creditors because Holding and Comsys supplemented the losses by financing the transaction account.[181]

Holding company (the parent) ultimately was found responsible for its decision to continue Services' (the loss subsidiary) operations, despite being aware that the structure would disadvantage creditors as soon as the financing by Holding ceased.[182] In other words, the court in *Comsys* assigned liability *despite* equity injections by the parent because those equity injections were a necessary part of a structure that ensured the nonpayment of debts.

In this case, the structure of LPD was such that both the income and the losses of LPD were incurred by LPD. Vichi does not allege, and could not allege, that the structure of LPD mirrored the corporate structure in *Comsys*. Therefore, I find unpersuasive Vichi's expert's opinion that the *Comsys* decision supports the proposition that a Dutch court would impose liability under the "unlawful act" doctrine in the face of what van Solinge refers to as "efforts to prop up a dying company" that allegedly occurred here.[183]

Having distinguished the only case that Vichi's expert cites for the proposition that a Dutch court would be willing to find liability despite equity infusions by the parent, I am convinced that a Dutch court would be unwilling to find liability in this case.

Because Philips N.V. has met its burden of adequately proving the substance of the foreign law—specifically, that Dutch law would not recognize a reference period even close to the 1,298 days Vichi posits here or impose liability where the parent made large capital contributions to the subsidiary in circumstances such as existed here—I grant summary judgment on Vichi's Dutch law claim in Philips N.V.'s favor.[184]

---

178. HR 11 September 2009, JOR 2009, 309 (Comsys) (Neth.).

179. van Solinge Rebuttal ¶ 43.

180. *See supra* note 171.

181. HR 11 September 2009, JOR 2009, 309 (Comsys) ¶ 5.2.1 (Neth.).

182. *Id.* ¶ 5.2.2.

183. van Solinge Rebuttal ¶ 43.

184. Having dismissed the Dutch claim based on the unprecedentedly long reference period, I need not address the third element of the "unlawful act" doctrine, *i.e.*, that the shareholder failed to take measures that could have prevented the creditor's losses. I also need not address Philips N.V.'s affirmative defense that Vichi was on notice of the risks of investing in LPD, and, therefore, cannot recover under Dutch law.

### G. Does Vichi's Unjust Enrichment Claim Fail as a Matter of Delaware Law ?

In Count II of the Complaint, Vichi seeks to recover on an unjust enrichment theory.[185] The elements of unjust enrichment are "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[186] In determining whether to award a remedy based on unjust enrichment, courts look for proof of the following elements: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.[187] Further, in evaluating a party's claim for an equitable remedy based on unjust enrichment, courts inquire at the threshold as to whether a contract already governs the parties' relationship.[188]

In claiming unjust enrichment, Vichi alleges that Philips caused Finance to issue the Notes and to receive Q200 million in exchange from Vichi, that Vichi was induced to provide the Q200 million in financing based on material misrepresentations by Philips, and that Philips was enriched by the infusion of those funds, which helped Philips satisfy its obligations under the Bank Loan.[189] In other words, Vichi alleges that Philips N.V. was unjustly enriched because Philips N.V. directly benefited from Vichi's loan to LPD, and Philips N.V. should not be permitted to retain the benefits it received from its "promise and accompanying deceits."[190]

Philips N.V. seeks summary judgment in its favor on Vichi's unjust enrichment claim on several different grounds, including that the claim is barred by the statute of frauds under English law. Having decided that summary judgment is not warranted based on the English statute of frauds,[191] I turn to another of Philips N.V.'s arguments: that Vichi's claim for unjust enrichment must fail as a matter of Delaware law.[192] Specifically, Philips N.V. argues that unjust enrichment cannot be used to circumvent basic contract principles, and that a plaintiff must show a direct, not attenuated, relationship between the plaintiff's alleged impoverishment and a benefit received by the defendant.

It is a well-settled principle of Delaware law that a party cannot recover under a theory of unjust enrichment if a contract governs the relationship between the contesting parties that gives rise to the unjust enrichment claim.[193] As an extension of

---

185. Compl. ¶¶ 159–64.

186. *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999).

187. *Cantor Fitzgerald, L.P. v. Cantor*, 1998 WL 326686, at *6 (Del.Ch. June 16, 1998).

188. *See MetCap Secs. LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989, at *19 (Del.Ch. May 16, 2007).

189. Compl. ¶¶ 160–62.

190. Pl.'s Answering Br. 63.

191. *See supra* Part II.D.

192. Def.'s Opening Br. 47.

193. *See, e.g., Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del.1979) ("Because the contract is the measure of plaintiffs' right, there can be no recovery under an unjust enrichment theory independent of it."); *see also Restatement (Third) of Restitution & Unjust Enrichment* § 2 (2011) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment.").

that principle, this Court also has held that "unjust enrichment cannot be used to circumvent basic contract principles [recognizing] that a person *not a party to [a] contract* cannot be held liable to it." [194] Delaware courts consistently have held that "where a contract exists 'no person can be sued for breach of contract who has not contracted either in person or by an agent', and ... that 'the doctrine of unjust enrichment cannot be used to circumvent this principle merely by substituting one person or debtor for another.'" [195] The rationale for this rule is that "the inability of a party to a contract to fulfill an obligation thereunder cannot serve as a basis to conclude that other entities, *who are not party to the contract,* are liable for that obligation." [196]

In this case, the contract at issue, *i.e.,* the Notes, was between Vichi (or SIREF or Mivar) and LPD or Finance; Philips N.V. was not a party to the contract. Thus, Vichi cannot use a claim for unjust enrichment to extend the obligations of the Notes to a nonparty, such as Philips N.V. [197]

Vichi nonetheless argues that unjust enrichment may be used in the absence of an enforceable contract or where there is doubt about the enforceability or the existence of a contract. [198] Here, there is no doubt that there was an enforceable con-

tract between LPD and Vichi (or SIREF or Mivar). To the extent that Vichi seeks to recover from Philips N.V. under that contract, his claim of unjust enrichment is barred. [199]

■■■ Vichi states, however, that he is not seeking to hold Philips N.V. liable as a guarantor of the Notes, but rather he bases his claim on Philips N.V.'s breach of its promise to stand behind LPD. Under *Kuroda,* a party may plead "in the alternative" claims seeking recovery under theories of contract or quasi-contract. [200] "This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract." [201]

As previously discussed, I am granting summary judgment on Vichi's claim for breach of Philips N.V.'s alleged promise to stand behind and support LPD. [202] Nevertheless, Vichi conceivably could argue that his unjust enrichment claim rests on a theory of quasi-contract.

Even so, Vichi's claim for unjust enrichment independently fails due to his inability to prove the existence of a genuine issue of material fact as to the third element of unjust enrichment—a relation between the enrichment and impoverishment.

■■■ To prove this element of unjust enrichment, a plaintiff must show that there is "some *direct* relationship ... be-

194. *Kuroda v. SPJS Hldgs., LLC,* 971 A.2d 872, 892 (Del.Ch. Apr. 15, 2009) (alteration in original) (emphasis added) (internal quotation marks omitted); *see also WSFS v. Chillibilly's Inc.,* 2005 WL 730060, at *19 (Del.Super. Mar. 30, 2005).

195. *See WSFS,* 2005 WL 730060, at *17 (citing *Chrysler Corp. v. Airtemp Corp.,* 426 A.2d 845, 855–56 (Del.Super.1980)).

196. *See MetCap Secs. LLC v. Pearl Senior Care, Inc.,* 2007 WL 1498989, at *6 n. 49 (Del.Ch. May 16, 2007) (emphasis added).

197. *Kuroda,* 971 A.2d at 892.

198. Pl.'s Answering Br. 63.

199. *See MetCap Secs. LLC,* 2007 WL 1498989, at *6 n. 49.

200. Pl.'s Answering Br. 63 (citing *Kuroda,* 971 A.2d at 892 n. 65).

201. *Kuroda,* 971 A.2d at 892 n. 65 (quoting *Albert v. Alex. Brown Mgmt. Servs., Inc.,* 2005 WL 2130607, at *8 (Del.Ch. Aug. 26, 2005)).

202. *See supra* Part II.E.1.

tween a defendant's enrichment and a plaintiff's impoverishment."[203] "In other words, there must be '[a] showing that the defendant was enriched unjustly by the plaintiff who acted for the defendant's benefit.'"[204]

Vichi asserts that the loan directly benefited Philips N.V. in five respects: (1) by reducing the amount of equity Philips N.V. needed to invest in LPD; (2) by reducing the risk that Philips N.V.'s guarantee of LPD's debt would be called; (3) by reducing the risk of LPD's failure; (4) by increasing Philips N.V.'s reputation in international credit markets; and (5) by protecting Philips N.V.'s brand image and reputation from potential damage due to the failure of LPD.[205] These assertions effectively can be reduced to three categories of enrichment: (1) a reduced likelihood of having to invest in LPD; (2) a reduced risk of failure and concomitant increase in the likelihood of success of LPD; and (3) reputational benefits to Philips N.V.

In regard to the first category—that Philips N.V. was enriched by a reduced likelihood of having to invest in LPD— Vichi relies on the deposition of Johannes Ingen Housz, Senior Vice President of Philips Global Corporate Finance, who stated that the Bank Syndicate asked Philips and LG to commit $600 million in liquidity to LPD.[206] According to Vichi, to avoid contributing $600 million, Philips and LG "elected instead to have LPD borrow Q200 million from Vichi."[207] Vichi, however, ignores the fact that Philips and LG made their decision to limit their contribution to $250 million in December 2001.[208] The loan from Vichi was not discussed until 2002. Moreover, the restructuring with the Bank Syndicate was completed five weeks before Vichi's loan, did not mention the loan, and was not predicated upon the loan.[209] These facts support a reasonable inference that there was not a relationship, let alone a *direct* relationship, between Vichi's loan and Philips N.V.'s ability to limit its contribution to LPD in late 2001 or early 2002 to $250 million. Vichi, therefore, has failed to demonstrate a genuine issue of fact as to whether there was a direct relationship between Vichi's loan and Philips's ability to reduce the amount of equity it needed to invest in LPD.[210]

As to the second category of enrichment—a reduced risk of LPD's failure and higher likelihood of success—Vichi's theory depends on the existence of benefits to LPD that one way or another benefitted

---

203. *Anguilla RE, LLC v. Lubert–Adler Real Estate Fund IV, L.P.*, 2012 WL 5351229, at *6 (Del.Super. Oct. 16, 2012) (emphasis added) (quoting *MetCap Secs. LLC*, 2007 WL 1498989, at *5).

204. *Id.* (alteration in original) (quoting *MetCap Secs. LLC*, 2007 WL 1498989, at *6).

205. Pl.'s Answering Br. 65–68.

206. Housz Dep. 75, 86–87.

207. Pl.'s Answering Br. 65.

208. Housz Dep. 75.

209. *See* Bright Aff. Ex. 18.

210. Vichi's theory that the loan reduced the *risk* that the Bank Syndicate would call Philips's guarantee is even more attenuated as it is premised on a reduction of risks. In that regard, Vichi mistakenly relies on *Reserves Development LLC v. Severn Savings Bank, FSB*, 2007 WL 4054231 (Del.Ch. Nov. 9, 2007), *aff'd*, 961 A.2d 521 (Del.2008), for the contention that enrichment has been found where a party's risk is reduced. To the contrary, the Court in that case found "that a direct relationship exists between Bella Via's enrichment, the increased value of its lots, and Reserves' impoverishment through the payment of infrastructure expenses in cash or land transfers." *Id.* at *13.

Philips N.V. Vichi contends that the loan benefitted LPD by reducing LPD's dependency on the bank loan, giving financing flexibility to LPD, and improving the liquidity protection of LPD.[211] But, these benefits run to LPD. Philips N.V. only benefitted to the extent that the reduction of risks of LPD's failure improved Philips N.V.'s balance sheet and increased the "potential dividends" Philips N.V. might have collected from LPD.[212] In any event, the direct benefit of Vichi's loan ran to LPD, not to Philips N.V. Thus, Vichi has failed to create a genuine issue of material fact that a *direct* relationship existed between Vichi's loan and Philips N.V.'s enrichment.

Finally, the reputational benefits alleged by Vichi are too attenuated to be considered a "direct benefit" to Philips. Vichi avers that the loan enabled Philips to reap reputational benefits in the credit markets and preserve its "brand image." [213] Reputational benefits, such as these, are nebulous and difficult to quantify. The implicit purpose of the "direct relationship" requirement is to ensure that a court accurately can reverse the unjust retention of a benefit to the loss of another. Where the relationship between the impoverishment and enrichment is attenuated or speculative, the court has no such assurance. Here, Vichi has not alleged facts sufficient to show a direct relationship, but instead has identified benefits for which this Court could only speculate as to their value.[214]

Vichi, therefore, has failed to adduce sufficient evidence to create a genuine issue of material fact as to whether there was a direct relationship between Philips N.V.'s alleged enrichment and Vichi's impoverishment—a "crucial" part of an unjust enrichment claim.[215]

For the foregoing reasons, I grant summary judgment in favor of Philips N.V. on Vichi's claim for unjust enrichment (Count II).

## III. CONCLUSION

For the reasons stated in this Opinion, I grant Philips N.V.'s motion for summary judgment on Counts II (Unjust Enrichment), IV (Breach of Implied or Oral Contract under Italian law), and XI (Breach of Fiduciary Duty under Dutch law), and dismiss each of those counts with prejudice. I deny Philips N.V.'s motion for summary judgment in all other respects, including as it relates to Counts V (Breach of Oral or Implied Contract under Delaware law), VI (Fraud under Delaware law), and VII (Fraud under Italian law).

**IT IS SO ORDERED.**

---

211. Pl.'s Answering Br. 66.

212. *Id.* at 66–67.

213. *Id.* at 67–68.

214. *See, e.g., 800 Servs. Inc. v. AT & T Corp.,* 30 Fed.Appx. 21, 24 (3d Cir.2002) (granting summary judgment on an unjust enrichment claim that relied on evidence based on speculation and conjecture).

215. *See MetCap Secs. LLC v. Pearl Senior Care, Inc.,* 2007 WL 1498989, at *5 (Del.Ch. May 16, 2007) ("Also crucial—but lacking here—is that some direct relationship be alleged between a defendant's enrichment and a plaintiff's impoverishment.").