COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

November 28, 2014

Emily A. Farley, Esquire
Community Legal Aid Society, Inc.
840 Walker Road
Dover, DE  19904

Kashif I. Chowdhry, Esquire
Parkowski, Guerke & Swayze, P.A.
116 West Water Street
Dover, DE  19904

> Re:   *Mack v. Mack*
>         C.A. No. 4240-VCN
>         Date Submitted: April 10, 2014

Dear Counsel:

This post-trial letter opinion sets forth the Court's findings of fact and conclusions of law regarding a dispute between mother and daughter, primarily about the disposition of funds held in a joint bank account.  Plaintiff Elaine Mack ("Mother") accuses her daughter, Defendant Beverly Mack ("Daughter"), of improperly converting the funds held in a joint bank account for Mother's benefit and family emergencies.  Mother also asserts that Daughter's actions with regard to a jointly-owned dwelling amounted to waste.  Daughter's conduct cannot be

condoned; the question is whether her deplorable actions result in monetary liability.

* * *

William Harold Mack, husband of Mother and father of Daughter, died in an accident on Thanksgiving Day 1979. A few weeks later, on December 13, 1979, Mother and Daughter went to a branch of the First National Bank of Wyoming (the "Bank") and set up joint checking and savings accounts.[1] The signature cards for the accounts provided in part:

> JOINT ACCOUNT—PAYABLE TO EITHER OR SURVIVOR
> It is agreed and understood that any and all sums that may from time to time stand on this account, to the credit of the undersigned depositors, shall be taken and deemed to belong to them as joint tenants and not as tenants in common: while both joint tenants are living, either may draw and in case of the death of either, this Bank is hereby authorized and directed to deal with the survivor as sole and absolute owner thereof.[2]

In the aftermath of the family tragedy, Mother was concerned about the handling of family finances in an emergency, and a joint account provided a means

---

[1] For convenience, the Court sometimes refers to the joint account even though there were several such accounts (or certificates of deposit) over the years; the substantive terms did not vary from one account to another.
[2] JTX 2.

for achieving that objective. At the time, Mother and Daughter had an apparently typical relationship. Mother's son and Daughter's brother, William Gerald Mack, had maturity and alcohol issues then, which partially explain why Daughter was chosen as the joint tenant. Although Daughter understood Mother's motivation for establishing the joint accounts, no actual agreement or understanding was reached by Mother and Daughter that imposed restrictions on the funds in the accounts. The joint account over the years was almost exclusively funded by Mother. Mother made most of the withdrawals, but Daughter did make some withdrawals, many of which came after she obtained Mother's approval or acquiescence. The terms of the signature cards, for the initial accounts and other joint accounts established in the interim, did not change.

On four occasions in August and September 2006, Daughter withdrew virtually all of the funds from the joint savings account without first informing Mother. Those withdrawals amounted to $107,000. Mother, needing funds for the purchase of a dwelling, went to the Bank shortly thereafter and was devastated to learn that the account had been stripped.

Mother wants "her" money back. She maintains that Daughter's withdrawals lacked justification because an agreement with Daughter before (or at the time of) opening the joint account confirms her rights to the funds. Moreover, she points to how the account was handled for decades as course of conduct proof of what the joint tenants intended. Even absent a supplemental agreement, Mother broadly contends that Daughter lacked a good faith justification for her actions. In her first claim, Mother relies upon the doctrine of unjust enrichment.[3] Although it appears that Daughter has frittered away much of the money, she argues that, as a joint tenant, she was fully entitled to make the withdrawals.

\* \* \*

In addition, Mother and Daughter jointly owned real estate (the "Farmhouse Property") near Felton, Delaware. Mother could not occupy the Farmhouse Property because of health issues. Daughter was uncooperative in renting or selling the property. While the Farmhouse Property was vacant, substantial vandalism and burglary occurred. That conduct may have caused as much as

---

[3] Mother also maintained that Daughter breached fiduciary duties which she owed to Mother. That claim failed on summary judgment. *Mack v. Mack*, 2013 WL 3286245 (Del. Ch. June 28, 2013).

$330,000 in damages.[4]  Mother asserts in her second claim that Daughter's failure to act and her obstructive behavior amounted to waste.

* * *

The critical issue in the dispute over the joint account is what agreement defines Mother and Daughter's rights.  If the terms governing Mother and Daughter's joint account are defined only by the written agreement with the Bank (as evidenced by the signature cards), Daughter had the right to remove the funds in the account and use them for her purposes.[5]  Although there is no written agreement modifying the joint tenancy arrangement, Mother asserts that Daughter agreed that the joint account would be established and maintained for Mother's convenience as a means of funding family financial needs and that the funds in the

---

[4] The amount is in dispute.

[5] In some circumstances, a joint tenancy may come with fiduciary duties owed by one joint tenant to the other.  Those circumstances typically involve impairment of one tenant by age, dependency, health issues, and the like.  Mother was in her early forties and apparently in fine health when the joint account was established.  There was no basis for imposing fiduciary duties on Daughter at that time.  That the joint tenants are related does not necessarily alter the nature of a joint tenancy.

account would continue to be dealt with as her property.[6]   Mother's desire to establish a joint account was no doubt motivated by convenience and knowing that if the circumstances warranted it, the family's immediate financial needs could readily be met through the joint account.   Joint tenancy usually serves these objectives well, especially if one joint tenant does not simply grab the funds for personal benefit.   That those objectives may have motivated—and likely did motivate—Mother does not show that Daughter agreed to any such limits or that Mother was otherwise successful in modifying the joint tenancy provisions of the Bank's account documentation.   Mother may have assumed that Daughter knew her objectives and would honor them.   That assumption, in a typical family

---

[6] As a general matter, "a party to a joint bank account may withdraw and dispense with all of the funds from that account, and neither he nor his estate is liable to the other joint depositors for the withdrawn funds." *In re Estate of Vogel*, 684 N.E.2d 1035, 1038 (Ill. App. Ct. 1997).   The relationship between joint tenants with respect to their joint bank account "is a contractual matter," but the "form of the deposit is not conclusive, and the circumstances that by the terms of the deposit either person may withdraw the whole amount is not always dispositive of the issue of ownership." *Fecteau v. Cleveland Trust Co.*, 167 N.E.2d 890, 893 (Ohio 1960).   In other words, joint tenants may modify the normal terms and expectations regarding a joint account by agreement.

situation, would be reasonable; unfortunately, without more, an assumption is not enforceable simply because it is reasonable.

Uncertainty in the handling or disposition of bank accounts should, obviously, be avoided. That may be one consideration that motivated the Supreme Court's decision in *Walsh v. Bailey*,[7] which was issued well before the Mother and Daughter joint account was created. The parties who form a joint account (and perhaps even family members who are not included on the account) share the risks

---

[7] 197 A.2d 331 (Del. 1964). There, the Supreme Court concluded that a paragraph of the joint account agreement (which read "It is especially agreed that withdrawals of funds by the survivor shall be binding upon us and upon our heirs, next of kin, legatees, assigns and personal representatives.") was sufficient to preclude the introduction of parol evidence to show the intentions of the father (who had by then passed away) regarding the disposition of the funds in the joint account. The signature card for the joint account between Mother and Daughter similarly provided that "either [joint tenant] may draw [on the sums in the joint account]." Perhaps the documentation for the joint account between Mother and Daughter resolves the question of Daughter's rights to take the actions that she did. If parol evidence is not permitted and there is no room for the argument that, although Daughter could withdraw the funds, she withdrew them subject to the agreement she had with Mother, then the funds were Daughter's and she was free to do with them as she chose. Unless Mother establishes that Daughter agreed to be obligated and limited with respect to her use of the funds in the joint account, the result would be the same.

associated with the joint account. What happened here is an example of those pernicious risks.

Mother trusted Daughter. With time, the basis for that trust eroded, and Daughter's unsavory conduct ensued. Mother bears the burden of proving that Daughter agreed to the conditions Mother now wishes she had imposed. Unfortunately, she has failed to meet that burden with evidence of an express agreement.

Mother next attempts to support her claims that funds in the joint account were solely hers with other theories of contract beyond express agreement with Daughter. For example, Mother argues that her agreement with Daughter with respect to the use of the funds in the joint account can be implied through a consistent and longstanding course of conduct.[8] As she alleged in her Amended Complaint, Daughter "never made any use of [the funds in the joint account] with the sole exception of cashing a farm rent check."[9] The record shows, however, that

---

[8] Something of a distinction is drawn between the claim that Daughter did have the right to take funds from the joint account for her benefit and the claim that she could take funds but only for minor and ordinary uses.

[9] Am. Compl. ¶ 6.

Mother has significantly overstated the exclusiveness of her use of the account. In the early 1980s, virtually all of Daughter's bills were paid from the joint account.[10] Mother and Daughter had a joint Discover credit card that both used and was paid from the joint account.[11] Utility and maintenance bills for a farm property Daughter owned with her brother for approximately two decades were paid from the joint account.[12] Daughter wrote a limited number of checks on the account on a regular basis. Even though no withdrawal slips were provided to Daughter when the account was opened, she soon had authority to write checks, and she wrote them for her personal use. Indeed, her car payments came from the joint account.

In her post-trial brief, Mother has recast the contentions in her Amended Complaint to assert that Daughter's use of the joint account was limited to minor and ordinary expenditures.[13] Until Daughter drew down the account, the funds that she used from the joint account would qualify as "minor and ordinary." Yet, that she did not use her right, as conferred through her status as one of two joint

---

[10] Tr. 106-07.
[11] Tr. 119-20.
[12] Tr. 103-06.
[13] *See* Pl.'s Post-Trial Br. 38-40.

tenants, to drain the account does not support the conclusion that she had agreed to forego that right or otherwise had acquiesced in the surrender of that right. In short, modifying a contract through a course of conduct generally requires that the course of conduct be inconsistent with the contractual terms. Here, merely withdrawing relatively small amounts of money over time is not inconsistent with having the ultimate right to take all of the funds in the account. Thus, Mother has not demonstrated that the terms governing the joint account were modified in any material way by the parties' conduct over the years.

Additionally, Mother makes an argument akin to invoking the covenant of good faith and fair dealing. The covenant of good faith and fair dealing "is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain."[14] In substance, she contends that Daughter's decision to empty the joint account not only hurt Mother but was "against the fundamental principles of justice or equity

---

[14] *Chamison v. HealthTrust, Inc.--Hosp. Co.*, 735 A.2d 912, 920 (Del. Ch. 1999), *aff'd*, 748 A.2d 407 (Del. 2000).

and good conscience."[15]  Mother, especially knowing what she does now, may well have imposed different terms and, at the time of establishing the joint account, was likely to have had the power to protect herself from the difficulties that she now encounters.  She did not do so, and the covenant of good faith and fair dealing does not authorize a rewriting of the joint tenancy arrangement.

A theme running through Mother's case is that she was somehow "entitled" to the funds in the joint account.  She builds the argument on the source of the funds (generally provided by Mother), the use of the account over the decades (primarily, but not exclusively, by Mother), and her recollection of the purposes which motivated her to open the joint account in the first instance.  In a moral or ethical sense, Mother's position is understandable.  Yet, for an "entitlement" to prevail here, it must somehow be supported by fact or law.  That has not happened.

It is in this context that Mother presents her unjust enrichment claim.  To succeed on an unjust enrichment claim, a plaintiff must demonstrate: an enrichment, an impoverishment, a relation between the enrichment and

---

[15] *Nemec v. Schrader*, 991 A.2d 1120, 1130 (Del. 2010) (internal quotation marks omitted).

impoverishment, the absence of justification, and the absence of a remedy at law.[16]

There was an enrichment (the funds that Daughter took), an impoverishment (the same funds which Mother can no longer access), a relation between the impoverishment and the enrichment (evidenced by the flow of funds), and no adequate remedy at law (because there is no contractual right giving Mother what she seeks). That leaves the question of justification. The unappealing, but sufficient, answer is that Daughter had justification for what she did. By the terms of the joint account signature card, she could draw "any and all sums that may from time to time stand on this account." As set forth above, Mother did not prove any agreement changing or modifying either the terms of the joint account signature card or the fundamental aspect of this type of bank account: any joint tenant may withdraw the funds. Mother has not demonstrated any other possible constraint on Daughter's right to the funds, such as a fiduciary limitation. Thus,

---

[16] *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 58 (Del. Ch. 2012).

Daughter had justification for her challenged conduct and Mother's unjust enrichment claim fails.[17]

\* \* \*

In her waste claim, Mother does not contend that Daughter directly caused the damage to the dwelling—the vandalism and burglary were perpetuated by others.[18] Instead, she blames Daughter for her recalcitrance and refusal to agree to Mother's reasonable suggestions—involving the rental or sale of the property—which left the property uninhabited and, thus, an easy target for wrongdoers.

Daughter does not have a good explanation for her unwillingness to follow Mother's suggestions. Mother, however, does not explain why Daughter is liable for what happened.[19] Perhaps more importantly, Mother offers no prudential basis for limiting the extent of her argument. If joint tenants have a disagreement over a

---

[17] Moreover, unjust enrichment is not generally available as a theory to trump the contract (in this case the joint account agreement) that governs the relationship between the litigants. *Id.*

[18] *See* 25 *Del. C.* § 904 ("A . . . joint tenant . . . committing waste of the estate held in . . . joint tenancy . . . shall be liable to an action of waste at the suit of . . . her cotenant.").

[19] Daughter was not living in the Farmhouse Property at the time of the damage. She was no more in actual possession of the property than Mother was. A claim of waste typically lies only against someone in possession (and thus in control).

strategy for managing a property, and as a result, they suffer damage which arguably would not have occurred but for the disagreement, is the recalcitrant joint tenant responsible? A joint tenancy of this nature is, in the most general sense of the term, something of a partnership. When the joint tenants have material disagreements and collectively cannot effectively manage the property, dissolution (or partition) of the joint tenancy is the step prescribed by law.[20] Mother allowed the problem to fester, and while it is easy to appreciate why she did not want to undertake the effort to dissolve the joint tenancy, dissolution was the option that she should have elected. She had the means for addressing the problem; sitting back and essentially seeking to assign guarantor status to Daughter was not the answer.[21] In short, Daughter is not liable for waste.

---

[20] 25 *Del. C.* § 721.

[21] Even if someone were residing in the property, the damage caused by the wrongdoers might still have occurred. It is likely that the damage was one of the indirect consequences of the breakdown of the relationship between Mother and Daughter. That does not make Daughter liable for the vandalism and burglary, however.

* * *

For the foregoing reasons, judgment is entered in favor of Defendant and against Plaintiff.  Each party shall bear her own costs.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ John W. Noble*

JWN/cap
cc:    Register in Chancery-K